# Commonwealth *v.* Di Silvestro, Appellant (No. 1).

*Libel—Malice—Foreign consul—Privilege—Act of April* 11, 1901, *P. L.* 74—*Criminal law.*

The publishers of a newspaper charged a foreign consul with being a bastard, ignorant of his duties, illiterate, weak, despised, the product of corruption and intrigue; that with phenomenal bestiality he preferred to give shyster legal consultations to whoever might innocently apply to him as the representative of his country, and concluded: "may, at least, the contempt of the conscious crowd mark on the hardened cheeks of these productions of the impertinent favoritism an indelible stamp of infamy." In this and other issues the defendants wrote and published of the consul that he was a buffoon and imbecile, a swindler, a parasite, a blackmailer, a poltroon, an indirect descendant of royal loins, a man with a brainless head, dishonest, degenerate, an ass who had the good luck of clubbing instead of being clubbed. Some abuses were alleged relating to fees and relating to the expenditure of moneys furnished to the consul for home military purposes. These matters, however, were minor parts of the articles. *Held,* (1) that the articles were libelous in themselves, and therefore malicious and criminal; (2) that the facts being established by the personal testimony of the defendants, it became a question of law for the court to declare whether or not the communication was privileged; (3) that even if it should be conceded that a part of the articles could be deemed proper for public information, all immunity on that ground was lost to the defendants by the unfair and malevolent character of the publication.

*Libel—Evidence—Reputation—Good character—Criminal law.*

In a prosecution for criminal libel where the defendants avow the making and publication of a writing which the law declares to be a malicious libel, evidence of good reputation of the defendants is not material.

*Libel—Reasonable doubt—Criminal law.*

Where, in a prosecution for criminal libel, the defendants admit the publication, and that it applied to the prosecutor, and the court construes the publication as libelous per se, and therefore malicious and criminal, the court is not bound to charge that if the jury have a reasonable doubt of the guilt of the defendants, they may give the defendants the benefit of that doubt, and render a verdict of not guilty.

Reasonable doubt to which a defendant is entitled is, not one raised by the juror's personal information from hearsay or otherwise, or from his bias or prejudice, but must grow out of and be founded upon the evidence adduced on the trial.

Argued April 18, 1906.    Appeal, No. 257, Oct. T., 1905, by defendants, from judgment of Q. S. Philadelphia Co., Oct. T., 1905, No. 607, on verdict of guilty in case of Commonwealth v. Giovanni Di Silvestro and Joseph Di Silvestro.    Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY and HEAD, JJ.    Affirmed.

Indictment for libel.    Before WILTBANK, J.

The first of the publications upon which the prosecution was based was published in a newspaper called Il Popolo. Both the original, in Italian, and a translation were set forth in the indictment.

The translation is as follows :

"THE DOINGS OF NASELLI.

"It should be the duty of the honest, incorruptible and healthy press, to exercise an attentive, constant and inexorable control on the doings of the Consuls.

" Italy, impoverished by a bureaucracy devouring millions, victim of the political cliques, inclosed as within an enormous iron circle by the plague of militarism, supports with secular resignation, and with amazing carelessness, the enormous weight of the diplomatic expenses, which are the greatest drain on the blood of a people almost dead, and oppressed by a barbarous tributary system.

" In the early epoch of the new Italy, and also at the present

time, although in smaller proportion, in homage to the Royal House, only those who were born in Piedmont, or the indirect descendants of the Savoyian loins, were appointed consuls and ambassadors.  So that the court, or rather the low and vulgar intrigues of the court ladies, determined the appointments to such high and delicate office, and . . . . having to take care of the sons of their majesties' illicit relations, we have had and still have, consuls and ambassadors with sonorous names, but with empty heads.

" Minister Tittoni continues this dishonest system of nepotism.  Tittoni, the minister by the grade and will of the ladies, of . handsome appearance and with extensive relations, not accustomed to be over-scrupulous in illicit affairs, not long ago appointed to take charge of two consulates one of his nephews and a favorite of . . . . the Sporting Club of Rome.  So that the political gang still, and always, finds in the public treasury an open field to satisfy its wishes.  Italy, abroad, is represented by inept (sic), ignorant men, completely ignorant of their duties, derided because almost illiterate, not cared for because weak, despised because they are known to be the product of corruption and intrigue.

" This is precisely the case with Count Naselli ; perhaps also himself a consul by the grace of the Savoyian loins.  Let us examine him in his personal value : presumptuous, ignorant, impolite—he does not present any quality which might make of him an average consul of the lowest class.

" In the examination of his doings, the diagnosis is still worse, and this is not said through personal feeling, but as a real fact.

" The consul should live among the Italians ; study their needs ; their system of life ; their aspirations ; but Naselli prefers the American element, to the element which should be his first thought, because it is composed of fathers, brothers, mothers and wives of those who, at home, pay blood taxes to supply him, the consul, the salary which enables him to lead an idle and lazy life.

" He should be here among ourselves to watch over the Italians, to defend their rights, to protest and claim justice for any abuse, while he, with arrogance and phenomenal bestiality, prefers to give shyster legal consultations to whoever innocently may apply to him as the representative of his country ; whereas,

540 COM. *v.* DI SILVESTRO, Appellant (NO. 1).

he does not hesitate to take the odious repugnant part of defender and justifier of those who commit abuses, violence and vexations against the Italians.

" Count Naselli, in his consular work, should render less painful the condition of the emigrants subject to military service ; he should listen to their inquiries and give them advice, because . . . . he is well paid for this purpose; but being completely ignorant of the questions relating to the military service, to a frank and sincere declaration of his ignorance, he prefers an offending behavior really worthy of a consul dug out from the nullities of a presumptuous, stupid, weak and degenerate aristocracy.

" When requested and implored, he should provide for the removal of the causes which permit swindling and thievery, which are practiced against the emigrants at the landing station ; but having a weak and vile disposition, he prefers carelessness or a guilty acquiescence, only because in his servile bureaucratic soul he thinks that it is easier to take off his hat to prominent people enriched by crime, rather than ask for his countrymen the respect of the law.

" What does Count Naselli know of the emigration question ? What does he know of the relations between the Government, which he is called to represent, and the country which gives him hospitality ? What does he know of what can and should be done, for a numerous colony, like the one of Philadelphia ? Nothing, nothing. He is an ass, who has the good luck of clubbing instead of being clubbed. And Count Naselli gives good beating to the public Italian money.

" Our rebellious conscience imposes upon us the duty of denouncing to the public reprobation, as we brought before the public contempt, not long ago, the hideous mercenary figure of the Baron Mayor des Planches, a Piedmontese, always by the grace of the deplored favoritism, ambassador at Washington.

" The Baron des Planches, who having gone to examine the conditions offered by avaricious speculative companies, to Italian emigrants, traveled in trains de luxe, offered by the same companies, accompanied by a secretary of these insidious organizations of the American affarism, allowing the same companies to pay the bills for his banquets, while for the defense and pro-

tection of the Italians he should have exercised a scrupulous and diligent investigation against them.

" Of such elements easy to be corrupted, inept through deficiency of education, and on account of their incapacity to fulfill their duties, Italy feeds a large quantity, to its shame, on account of having abroad, through its own representatives, a luminous proof of the degeneration of its ruling classes.

" May, at least, the contempt of the conscious crowd mark on the hardened cheeks of these productions of the impertinent favoritism, an indelible stamp of infamy."

At the trial the defendants admitted the publication and that it was aimed at the prosecutor.

The court charged in part as follows :

What does the article say ? It is for you to determine. Primarily, you must consider the question of written translation, because we assume that you do not understand the Italian language. So far as you, or any of you, understand that language, you are at liberty to treat the article to which I refer, upon your examination of it, without reference to any translation. A written translation is what represents in another tongue the substance of a statement as that substance reaches the understanding of men of average intelligence, reading it in, and familiar with, the original language.

There has arisen some dispute as to the correctness of the translations offered in evidence. On the part of the commonwealth, a native Italian has produced the various versions of the several articles appearing in Il Popolo, including that which is the foundation of the indictment, and has informed us that these versions represent the spirit and expression of the papers. This testimony is corroborated by an expert in the Italian language, who has shown himself to possess an intimate familiarity therewith.

On the part of the defendants, an eminently respectable witness has been produced, who has made a translation of the article of June 3, 1905, for you, and you have that before you.

It appears that whilst there is a variance in these several versions, yet they all agree in producing to you an article which make charges against, and casts serious imputations upon, the

prosecutor. I instruct you that you may take these several versions and the several originals (that is to say, the article referred to and the other articles which have been offered in evidence), and from these it is your province to ascertain what actually was written and published by the defendants. Having thus ascertained the spirit and the expression of the paper, if you find these to be as contended for by the commonwealth and as indicated by the evidence, I instruct you that the article of June 3, 1905, is libelous in itself. Being thus libelous in itself, the law delares that article to be malicious and criminal.

\*    \*    \*    \*    \*    \*    \*    \*

On the part of the defendants, it is contended that the presumption of malice in the case is rebutted when one considers the circumstances of the public station of the prosecutor as the representative in this city, to a certain degree, of a foreign government, and in view of his duties as consul. So far as these subjects are testified to, and you reach conclusions of fact upon the testimony, you are to ask yourselves : Was there a case for comment in the public prints ? I instruct you that in my opinion, which, however, is not to bind you, there is not adequate evidence of a case inviting or requiring fair comment. That question of fact I leave to you, as I do all questions of fact here presented.

\*    \*    \*    \*    \*    \*    \*    \*

I instruct you that the law does not find in these particulars, or in any other particulars shown by the proofs, any rebuttal of the presumption of malice in the writing and publication of the article of June 3, 1905. But it is for you to consider, and if you find you may under your oaths determine otherwise under the facts and the law, then you would have to consider the circumstances of the comment and ascertain if the defendants had written and published only after seeking, with reasonable care, for information touching the conduct of the Italian consul and touching the truth or good faith of any reports on which they acted. On this head I am bound to instruct you that there is no evidence of their having proceeded in a just and even temper, with deliberation, industry and calmness to learn if there was or was not warrant for their procedure, and I leave to you the determination of the question whether in fact that is correct.

It may be a proper caution in me to proceed further and to state to you that even were there some ground for fair comment, it would be necessary that you should take into consideration the extravagance of expression and the persistence of repetition on the part of the defendants in order to ascertain whether or not these did not exceed the limits of proper public discussion. In regard to this, it is my duty, as in the other instances, to instruct you that the law finds the comments unreasonable and extravagant and beyond the sphere of the protection of the principle of fair comment.

\*   \*   \*   \*   \*   \*   \*   \*   \*

No community, I am bound to add as an officer of the law, could subsist in peace and good order if such conduct as that of the defendants (always assuming you should find as a fact that they acted as charged in the indictment, and this is for you) were allowed and sanctioned. It must be conceded on the part of right-minded citizens, it would seem, although with regard to that it is merely an expression of opinion which is not to bind you in any way, that the prosecutor owed it to himself to institute this proceeding.

\*   \*   \*   \*   \*   \*   \*   \*   \*

The case has been ably presented to you on the part of the defendants, and, so far as I have been able to gather that there is a defense, it is founded upon the suggestion that there were reasons which were adequate for the publication of these papers. I must leave to you that argument, that it may have the weight that you consider it to deserve.

\*   \*   \*   \*   \*   \*   \*   \*   \*

[Having thus ascertained the spirit and the expression of the paper, if you find these to be as contended for by the commonwealth and as indicated by the evidence, I instruct you that the article of June 3, 1905, is libelous in itself. Being thus libelous in itself, the law declares that article to be malicious and criminal.] [18]

[It may be a proper caution in me to proceed further and to state to you that even were there some ground for fair comment, it would be necessary that you should take into consideration the extravagance of expression and the persistence of repetition on the part of the defendants in order to ascertain

whether or not these did not exceed the limits of proper public discussion. In regard to this, it is my duty, as in the other instance, to instruct you that the law finds the comments unreasonable and extravagant and beyond the sphere of the protection of the principle of fair comment.] [19]

[There has been evidence offered as to the character of the defendants, but I am bound to say to you that as they admit they published these articles, it would be difficult, assuming that you reached the conclusion that they were otherwise guilty, to ascertain from the evidence of character that they were not guilty.] [20]

Defendant presented these points:

4. If the jury find that the matter contained in the said article is true, and the matter was proper for public information, and the publication was not maliciously or negligently made, then your verdict should be "Not guilty." *Answer:* That I decline to charge, on the ground that you have nothing to do with the truth or falsity of such averments of fact as there may be in the articles, and also on other grounds which I have indicated by my general charge. [21]

5. If the jury believe that the article in question admits of two constructions, one that it is libelous and the other that it is not libelous, you are bound by law to put upon it that construction which renders the article not libelous, and to acquit the defendants. This in pursuance of the principle of law that where one of two constructions may be put upon an act, the one which is consistent with innocence must prevail. *Answer:* I decline so to charge. [22]

6. The jury must take into consideration the evidence of the good reputation of the defendants in considering the question as to whether they are guilty of the crime of libel in this case. *Answer:* I decline so to charge, referring to my general charge for such answer thereto as I consider sufficient. [23]

8. If upon the evidence in the case the jury have a reasonable doubt as to the guilt of the defendants, they must give the defendants the benefit of that reasonable doubt and render a verdict of "Not guilty." *Answer:* That I decline to charge, because there is no evidence in the case on which you can found any reasonable doubt, such as is indicated in the point itself. [24]

Verdict of guilty, upon which judgment of sentence was passed.

On the rule for a new trial WILTBANK, J., filed the following opinion:

This was a trial of the defendants on four indictments for writing and publishing a libel of and concerning the prosecutor, who was the consul representing the Italian government in this city. The libel laid in the indictment was dated June 3, 1905, and appeared in a publication of that date called "Il Popolo." This article had been preceded by a publication somewhat of the same character on May 27, 1905, and it was followed by numerous publications at different times, on June 17, 24, July 1, 8, 15, 29, August 5, 12, 19, 26, of the same year. The writing and publication of these several articles was admitted by the defendants in the course of the development of the case for the commonwealth. The defendants were called in their own behalf to show that the prosecutor was a public official within the provisions of the 8th section of the first article of the constitution, and that the subject-matter of the libel was merely fair comment, and therefore within the protection of that section. A reference to the article must dispose of the question of fair comment.

It is opened by stating that it should be the duty of the honest, incorruptible and healthy press to exercise an attentive, constant and inexorable control on the doings of the consuls. It refers to the early epoch of the new Italy, and to a similar condition at the present time, when, in homage to the royal house, only those who were born in Piedmont, or the indirect descendants of the Savoyian loins, were appointed consuls and ambassadors; "So that the court, or rather the low and vulgar intrigues of the court ladies, determined the appointments to such high and delicate an office, and . . . . having to take care of the sons of their majesties' illicit relations, we have had, and still have, consuls and ambassadors with sonorous names, but with empty heads." It declares that Italy abroad is represented by inept, ignorant men, completely ignorant of their duties, derided because almost illiterate, not cared for because weak, despised because they are known to be the product of corruption and intrigue. And it adds, "This is precisely the

case with Count Naselli ; perhaps also himself a consul by the grace of the Savoyian loins. Presumptuous, ignorant, impolite—he does not present any quality which might make of him an average consul of the lowest class."

We need not reproduce the volume of criticism which the article contains. It says of the prosecutor that he, with arrogance and phenomenal bestiality, prefers to give shyster legal consultations to whoever, innocently, may apply to him as the representative of his country ; where he does not hesitate to take the odious, repugnant part of defender and justifier of those who commit abuses, violence and vexations against the Italians. It states how the duties of the consul should be performed with respect to the condition of the emigrants subject to military service, and declares that he prefers an offending behavior really worthy of a consul dug out from the nullities of a presumptuous, stupid, weak and degenerate aristocracy. It declares that he should provide a remedy for the swindling and thievery which are practiced against the emigrants at the landing station ; but that having a weak and vile disposition, he prefers carelessness or a guilty acquiescence, only because, in his servile bureaucratic soul, he thinks that it is easier to take off his hat to prominent people enriched by crime, rather than ask for his countrymen the respect of the law. It pronounces him an ass, who has the good luck of clubbing instead of being clubbed. It concludes thus : "May, at least, the contempt of the conscious crowd mark on the hardened cheeks of these productions of the impertinent favoritism an indelible stamp of infamy."

This article was followed by a note : " In future issues interesting articles, with documents, upon Nasellism. In the subsequent . . . . we shall contemplate how Count Naselli pockets money that should be expended in the better execution of the draft."

There does not appear to be in the article any statement of fact which might be made the subject of comment with a view to the enlightenment of the public.

The other publications of the series were even more violent. They impute to the prosecutor that he was a buffoon, an imbecile, a swindler, a parasite, a blackmailer, a poltroon, an indirect descendant of the royal loins, a man with a brainless head, dishonest, degenerate.

Independently of this question, however, the trial judge was of the opinion that the prosecutor was not a public officer within the meaning of the constitution. This left the case to be one of admitted guilt in the writing and publication of a malicious libel, and, accordingly, but one question presented itself: There being at bar a bald admission of the commission of the crime of what in law must be called a malicious libel, was it the duty of the trial judge to leave to the jury any question of doubt?

This subject claimed the closest attention on the argument of the rule for a new trial, and was raised by the answer of the court to the eighth point presented on the part of the defendants. That point was as follows: If, upon the evidence in the case, the jury have a reasonable doubt as to the guilt of the defendants, they must give the defendants the benefit of that reasonable doubt and render a verdict of not guilty.

The answer of the court was: That I decline to charge because there is no evidence in the case on which you can found any reasonable doubt such as is indicated in the point itself.

It was not necessary to refer to the technical defect in the point which precluded its affirmance. The claim that, upon the fair conception of a doubt, the verdict must be for the defendant, was too broad. In criminal procedure such a doubt might fall short of involving an acquittal, while supporting a recommendation to mercy, and a peremptory instruction upon the hypothesis presented would have been error. But the reason assigned at the trial was adequate.

The subject appears free from difficulty upon the ascertainment of the issue and the relation of the proofs to it. The facts as to which alone the jury might have had a doubt were facts sought to be set up in defense to rebut the presumption of malice. The facts of the indictment were all admitted by the defendants: the (1) writing and (2) publishing (3) of and concerning the prosecutor. The writing was in law libelous per se. Hence, as to the crime of criminal libel, it was fully made out, under the law, and there was no room for doubt; indeed, there was no issue of fact in any stage of the development of the case of the commonwealth.

In a criminal trial the benefit of the doubt must be of a doubt as to the facts; and even in libel, where the jury are

judges of the law as well as of the facts, the principle is the same. Some inaccuracy lurks in our familiar declaration that they judge of the law; but for our present purpose we need not enlarge upon this. It cannot be questioned that a jury's doubt as to the law was never contemplated. If they have a reasonable doubt as to the law, it is their duty to resolve it by instructions of the court, or upon praying further direction, not by a verdict of acquittal. Their best evidence of the law is the judge's declaration of it. Their doubt may be, not as to the law, but as to the application of it; but this is a doubt as to the facts, as to whether the facts make in all a case to which that law extends. In the case at bar, as we have seen, the defendants admitted the writing and publishing, and the truth of the innuendo that the prosecutor was intended. The court could under no circumstances permit the jury to doubt this. Then, nothing remained from which a doubt could arise in the defendants' favor.

The only issue of fact arose upon the presentation of the defense, and if we assume for the purpose of the argument that an issue thus arose, two considerations present themselves: first, it is clear that ordinarily to have doubt as to the facts would be to discredit the defense, upon whom the burden lay. To charge that the defendants should have the benefit of such doubt would be insensible. It would be a doubt against them, and an instruction to the jury to exclude the facts claimed, if they saw fit, would be to direct them to find the semblance of justification obliterated, and the criminal responsibility to remain as already established. If facts to rebut the presumption of malice are swept aside by the jury upon reasonable doubt, nothing remains but the malice. The defendants cannot complain that the court prejudiced them by not placing them in this situation.

The second consideration arises upon the presumption of malice. A jury may hear evidence in defense in rebuttal of this presumption, and may consider that whilst this evidence is not conclusive, it affords ground for doubt of the evil intent of the defendants. Of this, of course, the defendants should have the benefit. In the case at bar, however, no facts were shown which could justify such a doubt. It was not a case in which proof was produced of any significance, but a case in which

there was no proof.   It was asserted in argument that the defendants were privileged to offer fair comment to the public touching the conduct of his office by the Italian consul; yet the assumption that a representative of a foreign government was a public officer in contemplation of the 8th section of the first article of the constitution was not fortified by authority, and the recital of his actions showed nothing in which the public had concern.   With respect to these he is responsible only to his own government.   He does not owe his office to the suffrages of our people.

If, upon a practical confession of guilt, the court is to charge the jury in the mode requested, it would, in effect, be an intimation to the jury that they had the power in violation of their sworn duty to find a verdict contrary to the truth.

That the jury has the power to abuse its function is true, but that a court should be held to charge it to that effect on the ground that it is the defendants' right is, in our opinion, a proposition not only untenable, but shocking to the moral sense.

The rule for a new trial is discharged.

*Errors assigned*, among others, were (18–24) above instructions, quoting them.

*Joseph Gilfillan*, with him *Willard E. Barcus* and *George S. Graham*, for appellants.—Evidence of good reputation was admissible: Heine v. Com., 91 Pa. 145; Com. v. Cleary, 135 Pa. 64.

If there is one thing that is imbedded fundamentally in the administration of criminal justice, it is. the principle that the defendant must be proven guilty of the crime with which he stands charged, beyond a reasonable doubt: Rudy v. Com., 128 Pa. 500; Com. v. Swallow, 8 Pa. Superior Ct. 539 ; Com. v. Devine, 18 Pa. Superior Ct. 431; Com. v. Rider, 29 Pa. Superior Ct. 621.

*William A. Gray*, assistant district attorney, with him *John C. Bell*, district attorney, for the commonwealth.—Malice is inferred from the publication of the article itself: Neeb v. Hope, 111 Pa. 145; Com. v. Sanderson, 2 Clark, 54 ; Com. v. Brown, 1 Pa. Dist. Rep. 565; Barr v. Moore, 87 Pa. 385.

When the publication is not privileged, truth cannot be received in evidence: Com. v. Brown, 1 Pa. Dist. Rep. 565; Com. v. Costello, 1 Pa. Dist. Rep. 745; Com. v. Odell, 3 Pittsburg, 449; Com. v. Murphy, 8 Pa. C. C. Rep. 399.

Evidence of good reputation was inadmissible: Theel v. Com., 22 W. N. C. 58; Powell v. Com., 114 Pa. 265; Commonwealth v. Greybill, 17 Pa. Superior Ct. 514; Commonwealth v. Magee, 10 Phila. 201; Commonwealth v. Ridgeway, 2 Pa. Dist. Rep. 59; Commonwealth v. Duff, 7 Pa. Dist. Rep. 370; United States v. Susan B. Anthony, 11 Blatchf. 200.

Though evidence of good character is to be considered in determining the question of guilt or innocence, yet if the proof of guilt is clear and convincing, proof of previous good character cannot be looked to as ground of acquittal, and the jury may be so instructed: Edmonds v. State, 34 Ark. 720; State v. McMurphy, 52 Mo. 251; State v. Porter, 32 Oreg. 135 (49 Pac. Repr. 964); Jackson v. State, 76 Ga. 551; State v. Vansant, 80 Mo. 67; McQueen v. State, 82 Ind. 72; People v. Sweeney, 133 N. Y. 609 (30 N. E. Repr. 1005); People v. Hammill, 2 Park. Cr. Rep. (N. Y.) 223; People v. Mitchell, 129 Cal. 584 (62 Pac. Repr. 187); Wesley v. State, 37 Miss. 327.

Where the evidence does not suggest a doubt, and guilt is clearly proved, the failure of the court to instruct on reasonable doubt upon being requested so to do is not ground for reversal: Pilkinton v. State, 19 Tex. 214; Van Brown v. State, 34 Tex. 186; Nicholas v. State, 6 Mo. 6; State v. Schoenwald, 31 Mo. 147; McGuire v. State, 37 Miss. 369; Rideus v. State, 41 Tex. 199; Com. v. Gibson, 211 Pa. 546; People v. Neumann, 85 Mich. 98 (48 N. W. Repr. 290).

· *Albert B. Weimer* filed a special brief for the commonwealth on the question of reasonable doubt:

The doctrine of reasonable doubt in criminal cases had its origin in England, during the period when the penal code of England imposed the death penalty for slight offenses. When a man was to be hung for stealing a chicken, or a loaf of bread, the courts became astute to find ways of saving the prisoner. It had its earliest application some time in the latter part of the eighteenth century, and was probably based upon Sir Matthew Hale's maxim: "It is better that five guilty persons

should escaped unpunished than one innocent person should die." Sir William Blackstone in writing his commentaries over a bottle of port saw double and reproduced the maxim in the following form : " The law holds that it is better that ten guilty persons escape, than that one innocent suffer." Further exaggeration of the maxim is found in Starkie's Evidence, first published in 1824, in which it appears in the following form : " The maxim of the law is that it is better that forty-nine offenders shall escape, than one innocent man be condemned." Mr. Starkie took up the subject of the doctrine of reasonable doubt, and enlarged its scope by saying that the result of the evidence must be a " moral certainty, to the exclusion of all reasonable doubt." It must be remembered, however, that the first edition of his work, which was long the leading, and for a time the only, treatise on the subject of evidence, was published at a period when there was a strong reaction against the atrocities of the penal code. When these atrocities were subsequently removed by the beneficent legislation procured by the efforts of Sir Samuel Romilly, the reasons for the doctrine lost much of their weight. There is no reason why it should ever have been applied in Pennsylvania, where the criminal code has always been mild and humane. The doctrine has been applied in all manner of extreme and absurd ways, and has led to innumerable miscarriages of justice. It should not be considered a property right of the defendant, and should only be applied in a case where the evidence is so evenly balanced that the jury finds it impossible to decide one way or the other as to the guilt of the defendant. In such a case, and only in such a case, is it proper for the jury to apply the rule, and give the prisoner the benefit of the doubt.

An historical account of this subject may be found in an article entitled " Some Rules of Evidence, Reasonable Doubt in Civil and Criminal Cases," in Vol. X, Am. Law Rev., p. 642.

OPINION BY ORLADY, J., October 5, 1906 :

The defendants were convicted of criminal libel on a charge preferred by Count Nassilli, the Italian consul at Philadelphia. John and Joseph Di Silvestro were the owners of a newspaper (Il Popolo), published in the Italian language, and Carlo Fresco was the writer of the article set out in the indictment.

There were indictments against each of the defendants individually, and one against John and Joseph Di Silvestro jointly. The charge in each indictment was the same libel, and all four cases were tried together, a verdict of guilty being rendered in each case. This libel was dated June 3, 1905, and appeared in Il Popolo on that date. It had been preceded by a publication of the same character in the same newspaper on May 27th, and was followed by others of like import in ten subsequent issues of the newspaper of the same year. The ownership of the newspaper, the writing and publication of the different articles, and that the prosecutor was the person referred to therein were admitted on the trial by each of the defendants. While there was some slight controversy as to the technical meaning of some of the words used in the publication, the interpreters called by the commonwealth and the defendants agreed that the translations of the article as it appears in the indictment, as well as in the exhibits offered in evidence, are materially and substantially true and correct.

The article charged Count Nassilli with being a bastard, ignorant of his duties, illiterate, weak, despised, the product of corruption and intrigue; that with phenomenal bestiality he preferred to give shyster legal consultations to whoever might innocently apply to him as the representative of his country, and concludes : " May, at least, the contempt of the conscious crowd mark on the hardened cheeks of these productions of the impertinent favoritism, an indelible stamp of infamy." Taken with the other issues of Il Popolo there can be no question but that these defendants wrote and published of the prosecutor that he was a buffoon, an imbecile, a swindler, a parasite, a blackmailer, a poltroon, an indirect descendant of royal loins, a man with a brainless head, dishonest, degenerate, an ass who had the good luck of clubbing instead of being clubbed.

The trial judge instructed the jury that the article of June 3, 1905, is libelous in itself, and being thus libelous in itself, the law declares that article to be malicious and criminal. The defendants contended on the trial that the articles were privileged under article I., section 7, of our state constitution, as follows : " No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or for

any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury;" and the Act of April 11, 1901, P. L. 74, as follows: " That in all criminal prosecutions no convictions shall be allowed if the subject-matter of the publication relates to candidates for public office and is found, to the satisfaction of the jury, to be proper information or investigation and not to have been maliciously or negligently made. In all such cases the truth may be given in evidence to the jury."

There was nothing in any of the offers of evidence, which was excluded, to show the duty, character or tenure of the office of consul of Italy at Philadelphia. The articles were not addressed to any functionary having authority to redress grievances, and in many particulars related to matters not of public interest, but were clearly personal and defamatory of the prosecutor as an individual. In every way of reading the publication it is plainly and grossly libelous in itself; vile and opprobrious epithets were repeated even after an action in the civil court had been instituted by this prosecutor against these defendants, and they necessarily tended to degrade him in the opinion of the public: Wood v. Boyle, 177 Pa. 620.

Though some abuses were alleged relating to fees to be charged in conducting the affairs of the office of consul, they relate to possible rights of persons having business relations with a foreign official and in regard to which none of our citizens could be concerned. Nor would our public be interested in the expending of the moneys furnished by the Italian government to its consul for its home military purposes. The redress for such grievances would be effected through channels over which our laws would not have any control. However, such references represented but a minor part of the articles, and even if such part could be deemed proper for public information or investigation, which we do not concede, all immunity on that ground is lost to the defendants by the unfair and malevolent character of the publication. The occasion was not privileged, nor the prosecutor a public officer within the meaning of our law. The facts being clearly established by the personal testimony of the defendants, it became a question of law for the court to declare whether or not the communica-

tion was privileged : Neeb v. Hope, 111 Pa. 145; Briggs v. Garrett, 111 Pa. 404; Conroy v. Pittsburg Times, 139 Pa. 334; Jackson v. Pittsburg Times, 152 Pa. 406.

Under the record as the defendants made it the question of their good reputation was not material as an item of evidence, and could not have any bearing on the question of their guilt or innocence. Of what avail would it be, to show that the defendants were honest, truthful and law-abiding citizens, when they avow the making and publication of a writing which the law declares to be a malicious libel? Their past conduct as citizens could not change the legal conclusion flowing from their admitted acts.

An earnest argument is urged by the appellants in regard to the answer of the court to their eighth point (twenty-fourth assignment of error) as follows : " If upon the evidence in the case the jury have a reasonable doubt of the guilt of the defendants, they must give the defendants the benefit of that reasonable doubt and render a verdict of Not guilty ; " the answer being, " That I decline to charge because there is no evidence in the case on which you can found any reasonable doubt, such as is indicated in the point itself." In the general charge the trial judge fairly and fully submitted to the jury to find the correctness of the translation from Italian to English; the general meaning of the words used ; the versions representing the spirit and expression of the papers; whether the presumption of malice arising from the character of the publication had been rebutted; the intent and purpose as shown by the repeated publications ; whether the defendants had exercised reasonable care in securing information touching the conduct of the consul, and the good faith of the reports on which they acted; and in answer to the defendants' seventh point as follows, " The jury is the sole judge of the law and the facts in all criminal prosecutions for libel," replied: " That I affirm, without going into any consideration of the modification of the principle which may be stated here. It is according to the tenor of our general charge." The trial judge held more favorably in the defendants' favor than recent decisions require.

The question raised by the seventh point is not before us on this appeal and we are not bound by the court's answer to it. The answer to the eighth point (24th assignment of error) was

in strict accord with many decided cases. The vital facts, solely as facts, were made by the defendants' personal testimony. The writing of the articles, the publishing of them in their paper, Il Popolo, and that they concerned the prosecutor were distinctly and unqualifiedly admitted by the defendants on the witness stand, as well as by their counsel in argument. To what evidence in the case, as evidence, that the jury might possibly have any doubt in regard to, did this point refer? Surely, not the facts which the defendants furnished. They would not invite a doubt as to their own declarations or veracity, and to instruct the jury to have a reasonable doubt "upon the evidence" so given would be a mere play on words. The point carefully refrained from asking instructions upon questions of law, or mixed questions of law or fact, as that ground had been covered in the seventh point, and its answer was in their favor. Taking the facts so made, the writing, publication and innuendo as fixed by the defendants, the only remaining elements were purely questions of law, concerning privilege and malice, and these would not be included within the point as stated. The reasonable doubt to which a defendant is entitled is not one raised by the juror's personal information, from hearsay or otherwise or from his bias or prejudice, but must grow out of and be founded upon the evidence adduced on the trial. There was no question of credibility of witnesses, conflict of construction of the article, or doubt as to identity of the person meant.

In Theel v. Commonwealth, 22 W. N. C. 58, the defendant was indicted and convicted for distributing a book in violation of a statute. It was a question of law whether it was published and distributed in violation of law, and the court instructed the jury that as the defendant had admitted the publication, and the advertisements of medicines, drugs, nostrums or apparatus for the cure of secret or venereal diseases, as set out in the indictment, as contrary to the statute, they should find him guilty. On which instruction the defendant was convicted and the Supreme Court affirmed the judgment. In Powell v. Commonwealth, 114 Pa. 265, the court below said: "As the record now stands, the commission of the offense charged in the indictment is admitted, and it is therefore your duty to render a verdict of guilty." On appeal this judgment was affirmed.

The proper construction is put on the point in the opinion refusing a new trial: " If upon a practical confession of guilt the court is to charge the jury in the mode requested, it would, in effect, be an intimation to the jury that they had the power in violation of their sworn duty to find a verdict contrary to the truth. That the jury has the power to abuse its function is true, but that a court should be held to charge it to that effect on the ground that it is the defendants' right, is in our opinion a proposition not only untenable, but shocking to the moral sense." In the light of the defendants' testimony the answer to this point was correct.

The assignments of error are overruled, the judgment is affirmed, and the record remitted to the court below that the sentence of the court may be carried into effect.