O'Donnell *v.* Philadelphia Record Company, Appellant.

Argued December 3, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE, and JONES, JJ.

reargument refused April 14, 1947.

*Lemuel B. Schofield,* with him *Laurence H. Eldredge, W. Bradley Ward, Thomas D. McBride* and *Fox, Rothschild, O'Brien & Frankel,* for appellant.

*John D. M. Hamilton,* with him *Trudell Green, Thomas E. Comber, Jr.,* and *Pepper, Bodine & Stokes,* for appellee.

OPINION BY MR. JUSTICE LINN, March 29, 1947:

Defendant appeals from judgment on a verdict for plaintiff in an action for libel. Defendant's counsel states the controlling question to be "whether defendant had reasonable and probable cause for believing that which it published concerning the plaintiff." That was one of the questions; in addition, it was necessary for the jury to consider whether the publication was inspired by a proper motive and was made in a proper manner. There is evidence to support the verdict on all three grounds.

The libelous editorial appeared in defendant's newspaper April 18, 1941, and will be found in the reporter's

statement of the case. The learned trial judge instructed the jury that the following paragraph in the editorial was libelous per se: "John O'Donnell is a Naziphile. He makes no secret of it. On numerous occasions, to all friends and bar-flies within hearing, he has broadcast his sympathy with most of Hitler's aims—such as destruction of the British Empire, suppression of labor unions and liquidation of Jews." Those lines were printed in heavy type.

In our review of the record, we must apply two familiar rules in considering the oral evidence. (1) One of them was stated by the present Chief Justice in *Galliano v. East Penn Electric Co.*, 303 Pa. 498, 508, 154 A. 805, as follows: "On a motion for judgment n. o. v., the testimony should not only be read in the light most advantageous to plaintiff, all conflicts therein being resolved in his favor, but he must be given the benefit of every fact and inference of fact pertaining to the issues involved which may reasonably be deduced from the evidence: Mountain v. American Window Glass Co., 263 Pa. 181." (2) The other rule was referred to by the Chief Justice in *MacDonald v. Penna. R. R. Co.*, 348 Pa. 558, 562, 36 A. 2d 492, as follows: "Justice SHARSWOOD, speaking for this court, said in Reel v. Elder, 62 Pa. 308: 'However clear and indisputable may be the proof when it depends upon oral testimony, it is nevertheless the province of the jury to decide, under instructions from the court, as to the law applicable to the facts, and subject to the salutary power of the court to award a new trial if they should deem the verdict contrary to the weight of the evidence.' In Nanty-Glo Boro. v. Amer. Surety Co., 309 Pa. 236, 238, 163 A. 523, we said: 'This rule is firmly established' (citing cases). We said further: 'The credibility of these witnesses, without whose testimony plaintiff could not have recovered, was for the jury.' " See also the opinions written by Mr. Justice DREW in *Kindt v. Reading Co.*, 352 Pa. 419, 428, 43 A. 2d 145, and in *Schnitzer v. P. T. C.*, 354 Pa. 576, 578, 47 A. 2d 709.

The jury accepted the evidence supporting plaintiff's claim and rejected evidence and inferences from it offered to support the defense of privilege. Pursuant to the one rule, it was the duty of the jury to find the facts; pursuant to the other, it is the duty of the court to give effect to the facts established by the verdict.[1]

Defendant now contends that the plaintiff should not hold his verdict because he "admittedly made statements to one of the authors of the publication which support and justify the statement alleged to be libelous." We must reject that contention because it contradicts the verdict. It was the duty of the jury to find what the witnesses said and what they meant and whether the defense of privilege was made out.

There are seven assignments of error, all of which must be overruled. The first two complain that the court held the defamatory paragraph quoted above libelous per se. It requires no argument to show that the learned judge's conclusion was correct. The reason sufficiently appears in his instruction to the jury: "Now, as a mere abstract statement of a belief based upon an unworthy prejudice, there is nothing particularly libelous about that, but at that time there was sufficient common knowledge of what was being done by Hitler and the Nazis in Germany with respect to the Jews and others holding particular political or religious beliefs that the word 'liquidation' meant the wanton extermination or cruel oppression, in one form or another of a people because they happened to be of a particular race or held a particular religious or political belief. Now, to the free Americans among whom this paper was published, that is an atrocious charge, especially if false and unjustified. To say that a man believes in exterminating fellow human beings because of their race natur-

---

[1] The verdict was in the sum of $25,000, which was reduced by the court below to $8,000. On a former trial, the verdict was for the plaintiff in the sum of $50,000.

ally and inevitably holds him up to the hatred, ridicule and contempt of decent people, and unless such a charge is true or is made upon reasonable, probable cause, it is libelous in itself, and the law presumes that it inflicts injury upon the person against whom it is made." The subject was considered again in the opinion written on behalf of the court in banc and reported in 56 D. & C. 328.

The third assignment is to the refusal of a point for charge which, so far as we can understand it, had no relevance to the issue for trial; the point was therefore properly refused. The fourth and the sixth assignments are to the refusal of binding instructions and the refusal of the motion for judgment n. o. v.; as it was necessary to find facts from the oral evidence, the court could not take the case from the jury. On this subject, Judge GORDON said, ". . . the defendant called a number of witnesses, all conceded by the plaintiff to be reputable and well known Washington correspondents, to show that at various times, they had heard (and reported to J. David Stern, publisher of the defendant paper and one of the authors of the article in question) the plaintiff express opinions and sentiments respecting the treatment of Jews by Hitler and Nazi Germany, which, if communicated to the defendant, the trial judge told the jury furnished ample justification for the charge made in the editorial. Whether these witnesses did in fact so report to Mr. Stern, as testified by him and by them, rested entirely upon his and their oral testimony, and it was upon this question that the liability of the defendant ultimately turned. It was impossible, therefore, to give binding instructions for the defendant, or to sustain its motion for judgment non obstante veredicto, in view of the well settled rule that, where the proof of a fact rests entirely upon oral testimony, the credibility of the witnesses thereto is solely a question for determination by the jury trying the case." The fifth assignment is to the refusal of defendant's motion

for a new trial and raises the question whether there was abuse of discretion in dismissing the motion. No abuse of discretion has been shown. In dealing with this point, Judge GORDON said: "Had this been the only trial of the case, we would have acted well within our discretion in directing its submission to another jury, as was done after the first trial. We prefer, however, to accede to the judgment of two juries upon the fundamental question of liability, and to confine the exercise of our discretionary powers to keeping the amount of the verdict within reasonable bounds, in the light of all the evidence. The discretion of a court to grant as many new trials as may be necessary to bring about a verdict acceptable to it is not an absolute discretion, resting upon the personal judgment of the individual judge. It is a judicial discretion, which is limited by a proper recognition of the jury's function to determine factual matters; and when two juries have spoken so decisively upon the question, their judgment is not to be lightly ignored." The seventh and last assignment states that the entry of judgment on the verdict violated defendant's rights "under the Fourteenth Amendment to the Constitution of the United States by depriving it of property without due process of law in that it abridged its right of freedom of speech and freedom of the press." Defendant's brief contains nothing which, so far as we can understand it, supports the assignment. The case is very simple in its legal aspects. Did the defendant have reasonable and probable cause? Was defendant's motive proper? Was the manner reasonable? Was the asserted privilege abused? The jury on proper instructions took plaintiff's view of the evidence and rejected defendant's. We need not refer to what is said in appellant's brief about burden of proof because we deal with the record as presented; the evidence was sufficient to go to the jury.

Defendant contends that its liability should depend on whether it published the libel "solely for the purpose

of causing harm to the plaintiff." That is not the law of Pennsylvania. In *Hartman v. Hyman & Lieberman,* 287 Pa. 78, 83-84, 134 A. 486, Mr. Justice SIMPSON said: "It has often been said that a privileged communication is one made upon a proper occasion, from a proper motive, in a proper manner and based upon reasonable or probable cause: Conroy v. Pittsburgh Times, 139 Pa. 334; Wallace v. Jameson, 179 Pa. 98; McGaw v. Hamilton, 184 Pa. 108. The immunity of a privileged communication is the exception, and he who relies upon an exception must prove all the facts necessary to bring himself within it: Collins v. The Morning News Co., 6 Pa. Superior Ct. 330; Mulderig v. Wilkes-Barre Times, 215 Pa. 470; Montgomery v. New Era Printing Co., 229 Pa. 165; McGeary v. Leader Publishing Co., 52 Pa. Superior Ct. 35. Want of reasonable care and diligence to ascertain the truth, before giving currency to an untrue communication, will destroy the privilege: Clark v. North American Co., 203 Pa. 346, 351; Collins v. Morning News Co., supra; McGeary v. Leader Publishing Co., supra; Com. v. Costello, 1 Pa. Dist. R. 745, 747, per ENDRICH, P. J." While that statement was made in an action of slander of trade, it was repeated in the libel action of *Stevenson v. Morris,* 288 Pa. 405, 409 et seq., 136 A. 234. See, also, *Williams v. Kroger Grocery & Baking Co.,* 337 Pa. 17, 19, 10 A. 2d 8. The rule of those cases was reaffirmed in *Bausewine v. Norristown Herald, Inc.,* 351 Pa. 634, 645, 41 A. 2d 736, in an opinion written by Mr. Justice JONES.

Counsel for plaintiff contends that defendant's attacks on him in the same editorial in which defendant praised plaintiff's employer are evidence from which the jury could find that defendant was maliciously trying to have plaintiff discharged from his employment, referring, in this connection to Mr. Stern's testimony: "Q. Well, you were only interested in Mr. O'Donnell's connection with the papers he represented, weren't you? A. That was all." In addition, defendant repeated the

libel [2] by publication August 8, 1942, long after the original publication and after the United States was at war with Germany, and after this suit was brought. This republication was relevant in the jury's inquiry; if there was abuse of privilege in the original publication, the jury may have found the republication convincing evidence of wrong motive, of actual malice; see Newell: Slander and Libel, 4th ed., section 287, p. 322; *Seip v. Deshler*, 170 Pa. 334, 32 A. 1032; *Thompson v. McCready*, 194 Pa. 32, 40, 45 A. 78; *Williams v. Hicks Printing Co.*, 159 Wisc. 90; *Halley v. Gregg*, 74 Iowa 563; *Behee v. Mo. Pac. R. R. Co.*, 71 Tex. 424; *Westerfield v. Scripps*, 119 Cal. 607; *Austin v. Remington*, 46 Conn. 116; *McDermott v. Evening Journal Ass'n*, 43 N. J. L. 488. The jury was instructed to find "whether the publication itself, in its tone and format, revealed such malice as robbed it of its privileged character." This was in accord with our decisions: *Pittock and Mills v. O'Niell*, 63 Pa. 253, 258; *Neeb v. Hope*, 111 Pa. 145, 153, 2 A. 568; *Wallace v. Jameson*, 179 Pa. 98, 116, 36 A. 142; *Conroy v. Pittsburgh Times*, 139 Pa. 334, 21 A. 154; *Weglein v. Golder*, 317 Pa. 437, 440, 177 A. 47.

Judgment affirmed.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE MAXEY.

I dissent from the majority opinion. The question for decision in this case is whether the evidence war-

---

[2] Defendant's newspaper of August 8, 1942, printed on the front page an article containing the following: "On April 18, 1941, we published an editorial stating that John O'Donnell, head of Joe Patterson's Washington Bureau, and Joe's close friend and adviser, was a great admirer of the Nazis, a hater of the British Empire, an advocate of the destruction of trade unions, and *quite pleased by the liquidation of Jews by Hitler*. The occasion for that editorial was an unfair and untrue article signed by O'Donnell, attacking the integrity of the President, which was run in Joe's Daily News. (Italic supplied.)

"So vicious and so sinister was O'Donnell's diatribe that President Roosevelt himself called it 'a deliberate lie.' " This sentence was made conspicuous by the use of heavy type.

ranted the jury's returning a verdict for the plaintiff. The judge who presided at this trial thought so little of plaintiff's case that in his opinion he said: "The trial judge was impressed by the plaintiff's obvious quibbling, evasions, and his manifest want of sincerity and veracity, and was utterly unable to credit his professed freedom from violent and odious anti-Semitic sentiments and predilections. Had this been the only trial of the case, we would have acted well within our discretion in directing its submission to another jury, as was done after the first trial."

I am confident that this is the only case in the annals of judicial trials where a judge has allowed a palpably erroneous and unjust verdict in favor of a plaintiff whom the judge characterizes as "quibbling", "evasive" and "manifestly insincere and unveracious", to stand be-cause the same erroneous and unjust verdict was given the same plaintiff by another jury, on the same evi-dence. In mathematics twice nothing is nothing; in law a deficiency of proof is still a deficiency even though repeated on a second trial. In the case of *Dinan v. Supreme Council*, 213 Pa. 489, 62 A. 1067, which had been tried five times, this court in an opinion by Justice BROWN said: "In all cases where the court is satisfied that the finding of the jury is against the truth, justice will not be administered unless it is set aside, . . . But for the power lodged in courts to set aside untrue findings, the infliction of injustice could not be avoided, for, great as may be the jury system, whims, sympathies, prejudices and caprices at times influence and control the judgment of men, even when sworn to be guided only by the law and the evidence in the case. The remedy for a perverse verdict, or for one so clearly against the weight of the evidence that it will result in wrong, if allowed to stand, is to set it aside and grant a new trial, and the power to do so, existing in the trial court, ought to be unflinchingly exercised: Kohler v. Pennsylvania R. R. Co., 135 Pa. 346."

One can read the testimony in this case "in the light most advantageous to the plaintiff, all conflicts therein being resolved in his favor" and give him "the benefit of every fact pertaining to the issue involved which may reasonably be deduced from the evidence" without finding any adequate legal support for this verdict which, as the trial judge himself intimates would not be allowed to stand if the unjust verdict had not been the product of a *second* trial. This court should not permit *two unjust* verdicts to be accepted as the equivalent of one *just* verdict.

In *Maloy v. Rosenbaum Co.*, 260 Pa. 466 at 472, this court in an opinion by Justice MOSCHZISKER said: "A grave responsibility rests upon the trial judge to see to it that no verdict contrary to the weight of the evidence or shocking to judicial conscience is allowed to stand, *no matter how many new trials must be granted in order to effect the ends of justice.*" (Italics supplied.) In *Bradican v. Scranton Railway Co.*, 260 Pa. 555, 558, this court said: "At a retrial of this case, should the judge who sees and hears the witnesses then feel that, on the whole record, a judgment for plaintiffs would represent an absolute miscarriage of justice, in the event of a verdict calling for such a judgment, it will be the duty of the court below, not to enter judgment for defendant, but to grant a new trial." Chief Justice SHAW in *Cunningham v. Magoun*, 35 Mass. 13, said: "When, therefore, the evidence is clear, plain and strong, and the law has been clearly and explicitly stated to the jury, and they decide against the law, it imposes upon the court the duty of interfering, because it must be apparent, that the jury have either unintentionally erred, by mistaking the terms of their instructions, or misapprehended the weight of the evidence, or that they have mistaken their duty or abused their trust."

In *North Pennsylvania Railroad v. Commercial B'k*, 123 U. S. 727, the Supreme Court of the United States in an opinion by Justice FIELD said that the court's direct-

ing the jury to return a verdict for one of the litigants "is eminently proper when it would be the duty of the court to set aside a different verdict, if one were rendered. It would be an idle proceeding to submit the evidence to the jury, when they could justly find only in one way". In *Union Pacific Railway Company v. McDonald*, 152 U. S. 262, the U. S. Supreme Court, in an opinion by Justice HARLAN, said that the court should " 'direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it.' Delaware, Lackawanna &c. Railroad v. Converse, 139 U. S. 469, 472, and authorities there cited; Elliott v. Chicago, Milwaukee & St. Paul Railway, 150 U. S. 245; Anderson County Commissioners v. Beal, 113 U. S. 227, 241."

In *Pleasants v. Fant*, 22 Wallace Reports 116, 120, the U. S. Supreme Court speaking through Justice MILLER said : ". . . in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed . . . It is the duty of a court in its relation to the jury to protect parties from unjust verdicts arising from ignorance of the rules of law and of evidence, from impulse of passion or prejudice, or from any other violation of his lawful rights in the conduct of a trial . . . Must the court go through the idle ceremony in such a case of submitting to the jury the testimony on which plaintiff relies, when it is clear to the judicial mind that if the jury should find a verdict in favor of plaintiff that verdict would be set aside and a new trial had? Such a proposition is absurd, and accordingly we hold the true principle to be, that if the court is satisfied that, conceding all the inferences

which the jury could justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the court should say so to the jury." In *Herbert v. Butler*, 97 U. S. 319, the U. S. Supreme Court held that where the burden of proof is on the plaintiff, and the evidence submitted to sustain the issue is such that a verdict in his favor would be set aside, the court is not bound to submit the case to the jury, but may direct them to find a verdict for the defendant.

In *Bowser et ux. v. Penney Co.*, 354 Pa. 1, this court, speaking through Mr. Justice DREW, said "the trial judge should not permit an issue of fact to be presented to the jury, where the evidence is such that upon full belief and the drawing of all proper inferences, reasonable men could not reach the conclusion that there was negligence." In that case the issue was the existence of negligence; in this case the issue is the existence of reasonable and probable cause. Each issue was one of fact. Under the evidence in this case I do not understand how it is possible to reach any other just conclusion that there *was* reasonable and probable cause for the publication of the editorial. Such being the situation the trial judge should have given binding instructions for the defendant. Wigmore on Evidence, Vol. 1, sec. 21, p. 374 says: "The judge must cease to be merely an umpire at the game of litigation . . . The judge [whom Wigmore obviously disapproves of] weakly resigns himself to the position of 'a mere automaton, or at most the attitude of the presiding officer of a deliberative assembly, with no greater powers than those of announcing the utterances or conclusions of others.'"

In *Lovell Co. v. Houghton*, 116 N. Y. 520, 22 N. E. 1066, which was an action for libel and in which the issue was the existence of malice, the New York Court of Appeals said: "The case is barren of facts justifying or permitting an inference of express malice. Had it been submitted to the jury with such a result, it would

have been the duty of the court to set the verdict aside as against the weight of the evidence. The rule is, that under such conditions the court should refuse to submit a case to the jury." In *Hemmens v. Nelson,* 138 N. Y. 517, 34 N. E. 342, which was an action for slander in which the issue was whether or not the defendant mailed the letter in question, the New York Court of Appeals in an opinion by Judge O'BRIEN held that the evidence was so weak that "To submit the case to the jury upon such evidence would be . . . little short of a travesty upon the administration of justice." He also said where "the weight of evidence is so decidedly preponderating in favor of one side, that a verdict contrary to it would be set aside, it is the duty of the trial judge to nonsuit, or to direct a verdict, as the case may require." In *Denver Public Warehouse Co. v. Holloway,* 34 Colo. 432, 3 L. R. A. (NS) 696, the Supreme Court of Colorado said "if . . . the words complained of are such as must have been used honestly and in good faith by the defendant, the judge may withdraw the case from the jury and direct a verdict for the defendant." It was held in the libel suit of *Stuart v. Bell,* 2 Q. B. (Eng.) 341, 60 L. J. Q. B. N. S. 577, 39 Week. Rep. 612, that, the occasion being privileged and there being no evidence of actual malice, the court should have withdrawn the case from the jury and rendered judgment for the defendant.

In this opinion the evidence is fully reviewed and a reading of it will, in my judgment, disclose that *even without* O'Donnell's admissions against himself (hereinafter discussed) the evidence was such that no verdict for the plaintiff should be allowed to stand and that a new trial, and if necessary repeated new trials, should be granted (as has been done in other cases) so that the defendant should not be mulcted of eight thousand dollars for exercising its constitutional right by letting the public know that this plaintiff was in complete sympathy with Adolph Hitler and his Nazi gangsters at a time when the Nazi government was a menace to the

United States as well as to the remainder of the civilized world. The record justifies the further statement that with O'Donnell's admissions against himself the jury should have been directed to find a verdict for the defendant and since it was not so directed this court should enter judgment for the defendant n. o. v.

Plaintiff as a Washington, D. C., news reporter wrote an article which was published in the New York Daily News and the Washington Times Herald under date of April 17, 1941, stating that "charges that battle craft of the U. S. Navy and the Coast Guard are now giving armed escort to munition-laden British merchantmen leaving Atlantic ports for the European battlefront exploded in the Capitol last night. Detailed information that President Roosevelt himself is permitting the Coast Guard to accompany the ships of foreign belligerents from the harbors of Baltimore, Philadelphia and New York to a point in the Atlantic where they would be picked up by a U. S. Navy 'neutrality patrol' and thence escorted to a rendezvous determined by the British Admiralty, has already been placed in the hands of Senators."

On April 17, 1941, the President of the United States instructed his secretary to tell newsmen that plaintiff's article was "a deliberate lie". On the morning of April 17, 1941, J. David Stern, publisher of the defendant newspaper read plaintiff's news story and the official denial of it. Mr. Stern testified that he knew the plaintiff's reputation as an admirer of the Nazi system of government in Germany. Several newspaper men in Washington had informed Mr. Stern of conversations which they had had with the plaintiff, in which O'Donnell endorsed Nazi principles and practices.

Colonel Robert S. Allen, a Washington correspondent for the Philadelphia Record, discussed with Mr. Stern the above news story and its characterization by the President, and Stern and Allen collaborated in writing the editorial on which this trespass action is based.

It was published in the Philadelphia Record of April 18, 1941. The parts of the editorial which the plaintiff alleged contained false, malicious and defamatory statements of and concerning him are these:

"John O'Donnell is a Naziphile. He makes no secret of it. On numerous occasions, to all friends and bar-flies within hearing, he has broadcast his sympathy with most of Hitler's aims—such as destruction of the British Empire, suppression of labor unions and liquidation of Jews."

. . . . . . . .

"But when opposition to the Administration resorts to what the President feels necessary to denounce as 'a deliberate lie', then it also becomes right and proper that the public know the kind of man who is writing such news. Mr. O'Donnell feels so intensely on this subject that he may believe himself justified in resorting to any means to block the Administration. At any rate, he is not an unbiased reporter."

. . . . . . . .

"Perhaps they are right, but at times like these it is just as important for newspaper readers to know the character of Washington correspondents as it is to know the ownership of newspapers, which is required by law."

The trial judge ruled that no part of the editorial would support the action except that part which stated, in effect, that the plaintiff had repeatedly disclosed in conversation that he was in sympathy with "Hitler's liquidation of the Jews". The trial judge said to the jury: "I therefore charge you that these particular words were libelous in themselves because they imputed a baseness of character and a revolting attitude toward liberty and the sacredness of human life which one has no right to charge against another unless the charge either is true or, if not true, the person making it has reasonable probable cause for believing it to be true. The article in that respect I charge you was libelous per se."

The judge tried to make it clear to the jury that before a defendant can be found guilty of libel, the jury must find that his *intention* was to libel and not merely to state that which he *believed* to be true.

The trial judge further stated in his charge: "When a suit for libel is brought, the defendant has available to him as a defense to the charge of libel two principal defenses: one is truth and the other is privilege. An article is privileged, even if not true, if it was written and the charge made upon reasonable and probable cause for believing it, induced by a fair and reasonably careful examination of the facts before making the charge. If the defendant did that, even if the charge was not true in this case, the article is not libelous and the plaintiff is not entitled to recover any damages at your hands. Therefore, the single question of fact for you to decide in this case is whether the investigation the defendants made was a fair and reasonably careful investigation . . . you decide what information they had before them, and if they had the right to believe from it that the charge they were making was true, because it did, in fact, indicate the truth of the charge they were about to make, they had the right to make it and it would not be libelous in law."

On this issue as to whether or not the offending editorial was written and published upon reasonable and probable cause for believing it was true, the defendant called several witnesses. The first was Ulric Bell, vice president of the "Americans United for World Organization", who testified that in 1940 he was in Washington as a correspondent and that he had a conversation at the Metropolitan Club there with J. David Stern, of the Philadelphia Record. He told Mr. Stern, of the plaintiff's "anti-Semitic leanings". He said: "I repeated my wonderment at what had happened to John O'Donnell and his attitude toward the Nazis." Referring to a conversation the witness had with Robert S. Allen, he testified: "I said to Colonel Allen that John O'Donnell

seemed to have gone overboard in his attitude about the Germans, the Nazis, that he had told Allen that . . . he had heard O'Donnell say that he admired the way the Germans were carrying out their program, that he had said these things in such a way as to indicate his sympathy—as to indicate his sympathy for the whole program the Germans were carrying out, which included the liquidation of the Jews." The witness said that "O'Donnell expressed himself on this subject quite violently sometimes." The witness also testified that Edward Taylor in his book "The Strategy of Terror" had made reference to Mr. O'Donnell's anti-Semitic leanings.

Thomas L. McNamara, a witness, an employee since 1938 of the author of the Washington "Merry-Go-Round" column, Drew Pearson, testified that late in 1940 in the Washington office of the Philadelphia Record he told Colonel Allen that O'Donnell had been "up there broadcasting some anti-Semitic views". By "up there" he meant the "Press Club bar". He said: "I told Colonel Allen, John O'Donnell had stated [a few hours before] that in his opinion Hitler was right in his treatment of the Jews in order to build up Germany. O'Donnell was talking in a very loud voice, and as a matter of fact he was striking the table for emphasis occasionally during the time." He "thought that this particular conversation was of sufficient importance" to report it to Mr. Allen.

Kenneth Crawford, a newspaper man, testified that he had stated to O'Donnell that "the Nazi treatment of the Jews was sufficient to convince me that we had to help the enemies of Hitler, and that he didn't agree. I then remember that he in illustrating his position to me, used a figure of speech which I can recall, which was that the Nazis were bent on the highest degree of efficiency. When they build a road, for example, they build the road straight through, regardless of anything that got in its way. Anything there was wiped out, a military highway, and that in their treatment of the

minorities that the same technique prevailed. If a minority got in its way, it was brushed aside, and that in substance was what I told Allen." Crawford added that O'Donnell did not express any disagreement at all with the Nazi treatment of the Jews and he [Crawford] "was shocked because he did not".

Colonel Robert S. Allen, who at the time of the trial was an officer in the United States Army, testified that in 1940 and 1941 he was Chief of the Washington Bureau of the Philadelphia Record and also co-author of the "Washington Merry-Go-Round". He had known John O'Donnell since 1933. He talked to John O'Donnell in the barroom of the Bellevue-Stratford Hotel, Philadelphia, on June 24, 1940, at the time of the Republican National Convention in that city. O'Donnell expressed his opinion to the witness that "the British had started the war by giving the Poles hopes of support which he said the British had no intention of fulfilling". Colonel Allen said to O'Donnell, "You talk like a Nazi. That is the kind of stuff that Goebbels is putting out." O'Donnell replied, "Well, the Nazi have done a lot of good things in Germany. They cleaned up Germany, wiped out unemployment and they have restored the honor and standing of Germany as a nation in the world." Colonel Allen then asked O'Donnell: "What about freedom of religion and the clergy who had been killed and jailed for no other reason than they had refused to preach the gospel as the Nazi ordered them to do?" O'Donnell replied: "religion had not been suppressed in Germany". Allen said: "Then what do you call the atrocities that they perpetrated on the Jews, thousands of old people, women and children who have been killed for no other reason than they were born Jews? The conversation then got around to Communists and Communism, and we had some exchange of views on that, on which I pointed out that at the time the Russian Communists and the German Nazis were bedfellows; that they had signed a military pact to divide

up Poland." Colonel Allen then asked O'Donnell: "What do you call the atrocities that the Germans perpetrated against the Jews?" Allen said O'Donnell's answer was that "certain excesses—my recollection is that there had been some excesses. There probably had been some excesses, but that certain elements needed cleaning up in Germany, and it was from there, sir, that we led into the discussion—the discussion turned on Communists and Communism in Germany." He stated the conversation at that point was broken up by mutual friends coming in and we just split up. Colonel Allen promptly reported that conversation to Mr. Stern, of the Philadelphia Record. He and Mr. Stern then jointly prepared the editorial on which the libel suit was based.

Colonel Allen testified further that he had a conversation with Ulric Bell about John O'Donnell and his sympathy with the Nazi liquidation of the Jews. This conversation was held in his office in Washington. He stated that Bell had told him "that he [Bell] had had a conversation with O'Donnell in the Press Club bar, during which the question of the Nazi treatment of the Jews had been discussed, and that O'Donnell had condoned what the Nazis had done to the Jews".

The witness also said that he [the witness] had a conversation with Kenneth Crawford, whom he regarded as a "man of repute" and one upon whose statement one could safely rely. The conversation with Mr. Crawford was held early in March 1940. Crawford told Colonel Allen that O'Donnell had condoned the Nazi policy towards the Jews. The witness said, "Crawford expressed very great feeling about this attitude on the part of O'Donnell. It shocked him profoundly." Crawford had stated to Allen: "I am horrified and shocked and profoundly disturbed." The witness added that "The times were tense and critical times and these sentiments were not taken lightly." The witness further stated that Mr. Crawford, in the witness' presence, had talked to J. David Stern about O'Donnell's attitude.

He declared, "we considered O'Donnell's thoughts very startling and his pro-Nazi attitude summed it up".

Colonel Allen also testified that he knew Gardner Jackson and he regarded Jackson as a "man of repute and one worthy of belief". He had talked with Jackson at various times. The witness said: "He [Jackson] told me of a conversation that he had . . . late one night in the Press Club bar, in which he said the conversation lasted three or more hours and they had discussed a great many things, among them O'Donnell's attitude toward the Nazi treatment of Jews. . . . O'Donnell had defended the Nazi theories and practices regarding the Jews and minorities, other minority elements, and had defended them on the ground that the Nazis had been obliged to remove the Jews because many of them had become dominant in German affairs, government, business, and the professions, and that in order to enforce and put into practice the Nazi policies both at home and abroad, it had become necessary for the Nazis to eliminate the Jews and to get rid of them." The witness added that "John's attitude in this question of the Nazi treatment of Jews, his failure to speak out against it, and his condoning of it—it was just a general topic".

The witness said that Thomas McNamara was working for him and he placed absolute reliance on the information McNamara brought him. He had conversations at various times with McNamara "about this subject of O'Donnell's sympathy with the Nazi liquidation of Jews". Moreover, in the early part of November 1940 McNamara told him "that he had just overheard O'Donnell sounding off about the Nazis and his anti-Semitic views". He had heard O'Donnell say "that the Nazis had to get rid of the Jews in order to build up Germany". Colonel Allen told J. David Stern about O'Donnell's statements and his attitude towards the liquidation of the Jews. He said to Mr. Stern, "It is just a question now of what the Record is going to do about it". Mr. Stern replied, "Well, we will lay this thing before the

public, place it cold on the record. Everybody is in this thing one way or the other." The witness added, "It was fair to the public, who had to make the decision in a vital matter of war, that they should know all the facts, who these guys were who were preaching one side or the other. Mr. Stern dictated the editorial to my secretary. After she had written it up and gave me a copy and gave him a copy and read it over and a few minor changes, as I remember—" "Mr. Stern then called up Mr. Harry Saylor, the editor of the Record, and read it to him. He approved it." The witness was then asked this question: "Did you have any ill-will, personal animosity, or spite against this man personally, or thought of ever doing him any harm?" The witness replied "Absolutely not".

It was agreed between respective counsel that, since Gardner Jackson was not available as a witness at the second trial, certain portions of the testimony which he gave on the first trial of this case should be read in evidence. This was done. This evidence showed that Jackson was a Special Assistant to the Undersecretary of Agriculture, and that Jackson had had a conversation with O'Donnell in May or June of 1940 about O'Donnell's trip to Europe. Jackson stated that they discussed O'Donnell's attitude toward the Nazi System and O'Donnell spoke approvingly of it. Jackson testified that he said to O'Donnell: "I thought the treatment of the Jews in Germany was of itself so great a black mark on the establishment of the system that I could not possibly see how anybody could sympathize with a system which had risen to power on that kind of a procedure and platform against the Jews." O'Donnell remarked: "That the place of the Jews in Germany had become—so many of them had become dominant in the professions and in finance in Germany that the Nazis had no other recourse than to remove them from those positions. And I said that I could not understand why it was necessary to distinguish between Jews in prominent positions, in the professions or in finance, and

non-Jews; that I couldn't, for the life of me, find no distinction between them." "Q. What was his reply?" "A. Well, he said substantially what I said before; that in order to accomplish the reorganization of the Government, for efficiency and thoroughness, in accordance with its purposes, he thought that the Nazis had to remove the Jews from such positions of power and prestige." Jackson also testified that he had reported to Colonel Robert S. Allen his conversations with O'Donnell within a month afterwards. The witness said: "This conversation with Mr. O'Donnell, with John, about which I am testifying, impressed itself on my mind and disturbed me. So that I did talk not only with Bob, [Allen] but with several other people about it." The witness stated that he was friendly with O'Donnell and that there had been no bad feeling between them.

John O'Donnell, the plaintiff, was called in rebuttal. He admitted that he had a talk with Colonel Allen at the opening of the Republican Convention in Philadelphia in 1940. He denied that he, in that conversation, expressed sympathy with the Nazi or Hitler's treatment of the Jews. He testified: "I recall saying nothing with respect to the Jews." He was asked: "Did you in your conversation with Mr. Crawford express sympathy with the Nazis' or Hitler's treatment of the Jews?" He replied: "I did not. I recall saying the treatment was cruel." He was further interrogated: "Did you ever have any conversation with the witness Ulric Bell on these matters?" He answered: "No, sir, none that I recall." He said he had no recollection of the conversation in the barroom of the Press Club to which McNamara had testified.

He was asked in cross examination if there was any ill feeling between him and Gardner Jackson. He answered "No." He was asked: "Among men in the newspaper profession, is Mr. Jackson respected as a reliable reporter?" He replied "Yes." He also stated there was no ill feeling between him and Ulric Bell and that Bell

was respected as a reliable reporter. He stated there was no ill-will between him and Kenneth Crawford, who, he said, was looked upon as a reliable reporter. The witness also admitted there was no ill-will between him and Colonel Allen and that Allen was regarded in the newspaper profession "as a reliable reporter". He said there was no ill-will between him and Thomas Mc-Namara, who was also looked upon as a reliable reporter, as far as he knew. He admitted that he had a lengthy conversation with Gardner Jackson that lasted about three or four hours, and that they discussed Hitler and the Nazi practices. He was asked the following question: "In connection with the Nazi practices, the treatment of the Jews was mentioned in that connection, wasn't it?" He answered "Yes". He was asked: "Did you take the position, when that was mentioned, either justifying it or condemning it?" He answered: "We were neither trying to justify or condemn. We were trying to explain it." He was asked: "One question in the former trial was: 'Q. You did discuss the Jewish question, didn't you, during that discussion?'" The record shows that his reply was: "That was mentioned only very briefly. I think it was mentioned." At the second trial the witness admitted that such was his answer at the first trial. The witness was then asked: "Speaking of Nazis, did you say they had found it necessary to liquidate the Jews to carry out their announced program? If the program were to be carried out, the Jews along with the other minorities, they would have to be swept aside, and that it had already been announced by the Nazis?" He answered: "That is a fact. That is true." "Q. You said that?" "A. Yes." He was asked: "Did you say to Mr. Jackson that you thought the Germans had done an effective and thorough job at reorganizing the country?" He replied: "They certainly had, and we both agreed on that." "Q. You said it?" "A. Yes." He was asked this question: "You did discuss with Mr. Crawford the Nazi treatment of Jews didn't you?" He an-

swered: "Yes." "Q. Did you during that discussion with respect to that subject use the simile as Crawford testified that the Nazis built roads straight to the point and swept anything aside which got in their way?" "A. I think I did." "Q. So Crawford is correct on that?" "A. Yes, he is correct." He was asked: "You agree, do you not, that Allen did say to you during that conversation [at the Bellevue-Stratford], 'John, you talk like a Nazi'?" "A. I think he did. I am quite certain he did. We were discussing the German army at that time." He was asked: "After Allen had vehemently condemned the Nazis for their treatment of the Jews, did you say, 'Well, the Nazis have done a lot of good things in Germany. They have cleaned Germany up and put her back on her feet. They have wiped out unemployment.'?" He answered: "I recall saying that they had wiped out unemployment and put Germany back on its feet." He was asked: "Did Allen say to you, as he testified here, that in Germany atrocities had been perpetrated upon Jews, old people, men and women who had been robbed and killed for no other reason than they had been born Jews?" In reply he said: "He did say that, yes." "Q. Did you reply by saying: 'There probably have been some excesses, but certain elements needed cleaning up in Germany?'" "A. I said: 'There certainly have been excesses there.' Then there was a break in the conversation. Somebody came in. We were eating and hurrying away to write our stories and it turned to Communism." "Q. Turning at page 1400, here is a question that was asked the last time you testified. Just follow it carefully. 'Q. You understand me, don't you, Mr. O'Donnell? When you said that certain elements needed cleaning up in Germany, Allen said that was in reply to his confronting you with the proposition that there had been atrocities perpetrated upon Jews, old people, men and women who had been robbed and killed for no other reason than they had been born Jews. You understand that?' 'A. Yes.' 'Q. Allen said

that your reply to that was, "Well, there probably have been some excesses but certain elements needed cleaning up in Germany." First of all, do you remember Allen so testifying in. his depositions?' And your answer was, 'Yes'. 'Q. Was Allen right about that?' 'A. Yes.' Did you so testify when, as you said, your memory was better than it is now?" "A. Oh, yes, I would say yes." The trial judge then asked these two questions and received these two answers. "Q. Now do you say that that is what the conversation was?" "A. Yes, except my recollection is there was a break." "Q. No, before you said that was in reply to your particular observation about the Jews. Now you say it was or wasn't?" "A. I will say it was. That is my better recollection then."

In trying actions for defamatory libel it is important to keep in mind where the burden of proof lies. In *Conroy v. Pittsburgh Times,* 139 Pa. 334, Justice MITCHELL said: "The natural and logical order of proof is for defendant to show the information on which he relied for probable cause, and for the plaintiff then to meet it in rebuttal . . ." Justice MITCHELL cites the case of *Briggs v. Garrett,* 111 Pa. 404, 2 A. 513. In that case this court, in an opinion by Justice PAXSON, held that "whether a communication be privileged or not is a question for the court, not the jury."

In the instant case the defendant properly assumed the burden of proving facts to show that the editorial was privileged. The testimony of defendant's witnesses, if credited by the jury, showed that the communication (editorial) was made upon a proper occasion, from a proper motive, in a proper manner, and was based upon reasonable or probable cause, and that therefore it was privileged. If the trial judge held the view (as he apparently did) that this record did not warrant his declaring as a matter of law that the editorial was privileged, it would have been the better practice for him to direct the jury to make special findings as to the basic facts. We said in *Simpson v. Montgomery Ward & Co.,*

354 Pa. 87, 46 A. 2d 674: "In an action for malicious prosecution [1] where the trial judge must determine the existence or non-existence of probable cause, after certain basic facts are admitted or established, the procedure of 'special findings' by the jury is not only 'commendable' but practically necessary." We said in the same case: " 'It is the province of a special verdict to find and place on record all the essential facts in the case. . . . The jury must find the facts and the court declare the law on the facts so found.' " We recommend the requiring in all cases of defamation, of special findings by the jury where the trial judge thinks the basic facts are in dispute.

In *Williams v. Kroger G. & B. Co.*, 337 Pa. 17, 19, 10 A. 2d 8, this court in its opinion by Justice DREW said: "In an action of defamation defendant has the burden of proving that the circumstances under which he published the defamatory matter were such as to create a defeasible immunity. [citing cases.] It is the province of the court to determine whether defendant has met the burden of proof. If the facts are in dispute, the jury is called upon to consider the evidence and to pass upon the issues thus raised. It is for the court, however, to decide whether the facts found by the jury gave rise to this immunity [citing case], or to instruct the jury as to what they must find in order to hold that defendant is protected: Restatement of the Law of Torts, vol. 3, section 619 (1)."

The Restatement of the Law of Torts, vol. 3, section 613 declares: "(1) In an action for defamation the plaintiff has the burden of proving, when the issue is properly raised, (a) the defamatory character of the comunication, (b) its publication by the defendant, (c) . . . (d) . . . (e) . . . (f) . . . (g) abuse of a conditionally privileged occasion; (2) In an action for defamation the defendant has the burden of proving, when the issue

---

[1] Justice PAXSON said in *Briggs v. Garrett*, supra: "An action for libel is upon all fours with an action for a malicious prosecution."

is properly raised, (a) the truth of the defamatory communication, (b) the privileged character of the occasion on which it was published, (c) the character of the subject matter of defamatory comment as of public concern." . . . Ibid, section 618 declares: "(1) The court determines whether the subject of defamatory criticism is a matter of public concern. (2) Subject to the control of the court whenever the issue arises, the jury determines whether criticism was merely the expression of an opinion upon known facts or upon a true or privileged statement of fact or whether it carried with it a false implication of defamatory facts and whether it represented the honest opinion of its author and whether it was expressed for a proper purpose." Section 619 declares: "(1) The court determines whether the occasion upon which the defendant published the defamatory matter was privileged. (2) Subject to the control of the court whenever the issue arises, the jury determines whether the defendant did or did not abuse a conditionally privileged occasion." Section 613, comment f, of the Restatement reads as follows: "Existence of privilege and abuse thereof. If the defendant relies upon the defense of absolute privilege, he has the burden of proving it. If he establishes this defense, it is a complete bar to recovery. If he relies upon the defense that the communication was published upon a conditionally privileged occasion, he likewise has the burden of proving it. If he sustains this burden by evidence of the requisite quantity and quality, he will prevail unless the plaintiff takes up and sustains the burden of proving that the occasion was abused. The occasion may be abused because of the publisher's lack of belief or reasonable grounds for belief in the truth of the defamatory matter (see sections 600-602) ; because the defamatory matter was published for some purpose other than that for which the particular privilege is given (see section 603) ; because the publication was made to some person not reasonably believed to be necessary for the

accomplishment of the purpose of the particular privilege (see section 604) ; or because the publication included defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the privilege is given."

Appellee says: "Appellant chose to defend on the ground of privilege. As a necessary and vital part of that defense the appellant accepted the burden of proving probable and reasonable cause. It met that burden by the use of oral testimony only. Thereupon the case was 'one whose submission to the jury, was required.' " The answer to this is twofold. In the first place, it is *undisputed* that Ulric Bell and Thomas L. McNamara told the writers of the editorial in question that John O'Donnell had indicated his sympathy with Hitler's program of liquidating Jews and that Hitler was "right in his treatment of the Jews". Kenneth Crawford had told Allen that O'Donnell condoned the Nazi policy toward the Jews. Gardner Jackson also told Colonel Allen that O'Donnell had defended the Nazi practices regarding the Jews; that he, O'Donnell, stated it "had become necessary for the Nazis to eliminate the Jews and to get rid of them." *Since all these remarks were reported to J. David Stern or to Colonel Allen, or to both of them, and since there is absolutely no dispute that these remarks were reported to Stern,* this furnishes proof that Stern *had reasonable and probable cause for making the statement he did make about O'Donnell's being a Naziphile and that he, O'Donnell, was in sympathy with Hitler's aims, including the suppression of labor unions and the liquidation of Jews.* Besides, Allen, one of the authors of the editorial in question, had heard O'Donnell making these pro-Nazi statements. *There was, therefore, no basis for any finding that the editorial in question was not published on reasonable and probable cause* and the verdict of the jury so contrary to what the evidence called for should not be allowed to stand. In *Petrie v. Kaufmann Baer Co.,* 291 Pa.

211, 214, this court said: "It is the plain duty of trial courts to see that no verdict unjust and oppressive in amount is permitted to stand."

Appellee and the majority opinion cite the case of *MacDonald, Admrx., v. P. R. R. Co.,* 348 Pa. 558, 36 A. 2d 492. In that case the defendant, as we said, "came forward with evidence of a most persuasive character to explain the cause of the derailment as being one for which it was not responsible", and the credibility of the evidence was submitted to the jury *but when the jury disregarded the evidence and found for the plaintiff this court set aside the verdict and ordered a new trial.* The case now before us is far stronger against the plaintiff than was the *MacDonald* case, for O'Donnell's own testimony so conclusively convicted him of being a pro-Nazi in complete accord with the Nazi practices of robbing and killing (i. e. "liquidating") Jews that no jury had the right to ignore his testimony and proclaim by its verdict that the charge made in the editorial was *not* based on reasonable and probable cause for a belief in the truth of what the editorial stated. When O'Donnell was on the witness stand, he said "Yes" to this question: "Was Allen right about that?" The "that" which Allen was "right about" was Allen's testimony as to (1) his statement to O'Donnell on June 24, 1940, that "there had been atrocities perpetrated upon Jews, old people, men and women, who had been robbed and killed for no other reason then that they had been born Jews" and (2) O'Donnell's reply as follows: "Well, there probably have been some excesses but some elements needed cleaning up in Germany". When an individual refers to wholesale murders, in a sarcastic euphemism as "some excesses", there is no room for doubt that he is condoning the murders which constituted those "excesses". When O'Donnell stated that "certain elements needed cleaning up in Germany" he obviously meant Jews, for it was only Jews who were being "cleaned up" by Hitler on a wholesale scale. To

"clean up" means, as O'Donnell used the phrase, to "liquidate", that is, to "kill". When in war a detail of soldiers receives an order to "clean up" a machine gun nest, no one has any doubt that the order means to destroy that nest. If, after the assassination of Abraham Lincoln and the murderous assault on Secretary of State Seward, and the planned assassination of Vice-President Johnson, an individual who had been accused of expressing approval of these atrocities had, when later confronted with the expressions he had used, endeavored to "soften" them by referring to the conspirators' crimes merely as "some excesses", and had added that "certain elements in the Lincoln administration needed cleaning up", no one possessed of normal mental processes would have any doubt that the individual so accused had been in favor of the assassination program which he had referred to in toned down but sinister terms. Wigmore on Evidence, Second edition, Vol. 1, section 27, p. 232, says: "The conclusions and tests of everyday experience must constantly control the standard of legal logic." As Chief Justice GIBSON said in *Com. v. Harman*, 4 Pa. 269, 273: ". . . he who is to pass on the question [at issue] is not at liberty to disbelieve as a juror while he believes as a man."

The record clearly shows that the editorial in question was published from a proper motive, in a proper manner and based upon reasonable and probable cause. This nation was vitally concerned with what was taking place in Germany in 1939, 1940, and 1941, and if there were any Americans who at that period were in accord with the plans of Hitler to subjugate the world and to inflict suffering and death upon millions of human beings in order to satisfy his lust for power, it was the duty of newspaper publishers to expose them.[2]

---

[2] In our opinion in *David v. Veitscher Mag. etc.*, 348 Pa. 335, 35 A. 2d 346, we had occasion to discuss as pertinent to that case Field Marshal Goering's Governmental Decree excluding Jews from the German economic life and we said, inter alia: "Civilized

The proper motive of those who unmasked pro-Nazis in the United States is obvious. When an act is done on a proper occasion and from a proper motive, it is not malicious. Since the editorial giving rise to this action was published on a proper occasion and from a proper motive and based upon reasonable and proper cause, there was no basis for any finding that it was malicious. As Justice PAXSON said in *Briggs v. Garrett,* supra: "If probable cause exists in either case [that is, a case of either malicious prosecution or libel] the question of malice becomes of no importance."

It is an axiom that a free press is essential to the permanence of a government of constitutionally guaranteed freedom.[3] In 1941, the independence of this nation and the freedom of the American people were threatened by Hitler and his murder bund. It was the duty of the American press to expose anyone who ap-

---

men and nations look upon such a decree as Goering's as dishonest and brutal, and contrary to the natural dictates of justice."

Goering's Decree was dated at Berlin on November 12, 1938. The destruction of all Jewish synagogues in Germany and the murder of Jews and other forms of persecution of Jews in Germany at and before the time of the expression by O'Donnell of pro-Nazi sympathy, as testified to in this case are all matters of general knowledge.

[3] In the famous trial of John Peter Zenger in New York City in 1735 for seditious libel of the Governor of the Colony of New York, the renowned Philadelphia lawyer, Andrew Hamilton, in his address to the jury said: "Let us do our duty and like wise men, who value our freedom, use our utmost care to support liberty of expression in the printed word. It is the only bulwark vouchsafed to us today against lawless power which in all ages has sacrificed to its wild lust and boundless ambition the blood of the best men that ever lived." At the banquet which the people of New York City tendered Attorney Hamilton immediately after the acquittal of his client, Hamilton said in his address: "The right of the people to worship according to their consciences cannot endure unless there is a free press to defend that freedom. The right of the people to speak freely cannot endure less there is a free press to defend that freedom. The right of the people to meet publicly and talk over their troubles with their ruler cannot endure unless there is a free press to defend that freedom."

proved Hitler's purposes or condoned his practices. The Seventh section of the Bill of Rights in our State Constitution declares: "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." The First Article of the Bill of Rights of the Federal Constitution lists freedom of expression with freedom of religion, assembly and of petition and forbids Congress to enact any laws prohibiting any of these fundamentals of free government. Freedom of speech and of the press are among the fundamental personal rights and liberties protected by the due process clause of the Fourteenth Amendment to the Constitution of the United States: *Near v. Minnesota*, 283 U. S. 697; *Gitlow v. New York*, 268 U. S. 652; *Schneider v. State*, 308 U. S. 147.

Individuals are also entitled to have their reputations protected. The first section of the Bill of Rights in our State Constitution declares: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." The common law also protected the individual in the security of his good reputation. See Blackstone's Commentaries, Book 1, page 134.

When the plaintiff by his public utterances revealed that instead of having his moral indignation aroused by the Nazi murders and robberies of Jews in Germany he approved or at least extenuated, those hideous crimes, he to that wide extent had no reputation entitled to the law's protection, and the defendant rendered a praiseworthy public service in informing its readers as to what inhuman and uncivilized practices this man blatantly and shamelessly sanctioned.

We do not agree with the appellee that "the record establishes an abuse of the defendant's conditional privi-

lege." The plaintiff failed to meet the burden of showing such an abuse. He failed to show the publisher's lack of reasonable grounds for belief in the truth of the charge or that the editorial was published for some purpose other than its privileged purpose, or that the publication included defamatory matters not essential to the accomplishment of its privileged purpose.

Appellee says, "Exercise of the privilege is limited to communicating essential facts to the public in a fitting manner upon a question in which the public has an interest", and he then adds: "If in exercising this privilege the defamer resorts to 'inflammatory statements, exaggeration, unjustifiable comments, highly colored language' or should he resort to repetition he will lose an otherwise available defense." My answer is that the defendant's "communication *was* upon a question or subject in which the public had an interest", and I find nothing *un*fitting about its manner. I do *not* adjudge it to be "inflammatory", "exaggerated", "unjustifiable", "highly colored" or "utterly reckless". The language of an editorial or of a public address or of any other private or public communication may be bold and vigorous without being fairly subject to the characterization of the adjectives just enumerated. Some of the greatest deliverances of American and English jurists and statesmen and journalists have been bold and vigorous without being subject to the reproach the appellee casts upon the forthright Record editorial of April 18, 1941. There is neither law nor custom which requires journalists or public men in stating their own views or in criticizing the views, policies or actions of others, to employ the polite language used by diplomats in their communications with friendly powers. The ingratiating address of the drawing room is not required in the public forum.[4]

---

[4] As Sir James Mackintosh said in defending in the Court of King's Bench, England in 1803 Jean Peltier on a charge of libel

If plaintiff's testimony, quoted in this opinion, was not in this record the question whether or not the defendant had sustained the burden of proving that the editorial was a privileged communication would have been primarily a question for the jury on the basic facts as to whether or not O'Donnell had made the statements about the Nazi's treatment of the Jews which the defendant's witnesses said he made and whether or not they had reported these statements to the authors of the defendant's editorial. This testimony was not contradicted. Plaintiff himself testified to the good repute for reliability of defendant's witnesses. When the jury capriciously disregarded the uncontradicted evidence of these witnesses and returned a verdict contrary to that evidence, that alone called for the granting of a new trial, as we said in *MacDonald, Admrx., v. P. R. R. Co.,* supra.

In the instant case not only was uncontradicted evidence offered by the defendant that the editorial was based upon reasonable or probable cause, but the plaintiff himself in his own testimony supplied proof which so strongly corroborated the testimony of defendant's witnesses that the plaintiff was in sympathy with Hitler's policy of liquidating the Jews that no issue as to basic facts remained for submission to the jury, and it was therefore the court's duty to give binding instructions for the defendant. Since the court below did not do so, this court has the power to enter judgment for the defendant on this record. The Act of April 22, 1905, P. L. 286, 12 PS 682, provides that: "Whenever a point requesting binding instructions has been reserved or declined . . . the party whose motion for judgment

---

against Napoleon Bonaparte (Howell's St. Tr. vol. 28, p. 563, 570) : "To inform the public on the conduct of those who administer public affairs, requires courage and conscious security. It is always an invidious, and obnoxious office, but it is often the most necessary of all publc duties. If it is not done boldly, it cannot be done effectually, and it is not from writers trembling under the uplifted scourge that we are to hope for it."

non obstante veredicto has been declined . . . may thereupon forthwith appeal to the Supreme or Superior Court . . . [and the appropriate court] shall review the action of the court below, and shall enter such judgment for either party as shall be warranted by the evidence . . ." In this case the evidence warrants the entry of judgment for the defendant.

The entry of judgment for the plaintiff was based on a verdict whose factual support is totally inadequate and was apparently shocking to the trial judge. The majority opinion says: "Defendant now contends that the plaintiff should not hold his verdict because he 'admittedly made statements to one of the authors of the publication which support and justify the statement alleged to be libelous.' We must reject that contention because it contradicts the verdict. It was the duty of the jury to find what the witnesses said and what they meant and whether the defense of privilege was made out." I ask under what theory of administering justice a jury can be permitted to make a finding of fact in favor of a plaintiff *which finding is contrary to what the plaintiff himself testified under oath?* O'Donnell, as we have pointed out, *admitted* that "Colonel Allen was right" when he testified that after Colonel Allen said to him, that he (O'Donnell) "talked like a Nazi" and asked O'Donnell, "What do you call the atrocities that the Germans perpetrated against the Jews", he (O'Donnell) replied by characterizing these atrocities (murders) merely as "some excesses" and added: "Certain elements [obviously meaning Jews] needed cleaning up in Germany." When a jury, by its verdict finds that there was no reasonable and probable cause for characterizing such a pro-Nazi as O'Donnell by his testimony *admitted himself to be,* as "being in sympathy with Hitler's liquidation of Jews", *the contradiction* between the *verdict in favor of the plaintiff* and the *plaintiff's own testimony* is so *unmistakable* that no court can, in

justice, permit it to stand, and the judgment based upon it should be set aside.

When in the trial of a case a fact which will defeat the plaintiff's claim clearly appears from the testimony of the plaintiff himself, or from the testimony of his witnesses, there remains no issue to be submitted to the jury and the court should declare the fact established as a matter of law. For example, in *Miller v. Gault et al.*, 345 Pa. 474, 29 A. 2d 71, this court in an opinion by Mr. Justice LINN held that since from plaintiff's testimony the victim's negligence "clearly appears", the defendant was entitled to have judgment entered in his favor notwithstanding the verdict. This court has so ruled in many similar cases. In *Witkowski v. Lehigh Valley Railroad Co.*, 338 Pa. 510, this court speaking through Mr. Justice LINN (1) reversed the action of the court below in permitting the case to go to the jury and (2) entered judgment for the defendant non obstante veredicto, because the contributory negligence of the plaintiff clearly appeared from the evidence. In all these cases the judgment n. o. v. "contradicts the verdict."

In the instant case not only should the verdict be set aside but judgment should be entered for the defendant for two reasons, either one of which is sufficient to justify such entry of judgment: (1) The defendant's own admissions under cross-examination leave no room for doubt that the plaintiff was in sympathy with all of Hitler's policies, including his liquidation of the Jews, and the court should have declared that under the plaintiff's own testimony he was not entitled to a verdict. (2) The fact was undisputed that several journalists whose good repute for reliability plaintiff himself admitted had told the writers of the editorial, of the plaintiff's expressions of sympathy with Hitler's policies towards Jews.

In *Timlin v. American Patriots*, 249 Pa. 465, 469, 95 A. 104, this court said: "The jury ought not to

have been permitted to capriciously disbelieve him [defendant's witness] on a material matter, but should have been instructed that the plaintiff could not recover." This court also said in *Lerch v. Hershey Transit Co.*, 246 Pa. 473, 476, 92 A. 693, ". . . the jury ought not to have been given a license to indulge in an utterly unfounded and capricious belief that the conductor had given the signal."

Even if what the journalists who testified in this case reported to the writer of the editorial about the plaintiff's expression of pro-Nazi, anti-Semitic sentiments had *not* been true, yet since it is not disputed that the writers of the editorial believed what had been told to them, it follows that the defendant had reasonable and probable cause for writing and publishing the editorial and the court should have so declared as a matter of law, since the responsibility of deciding whether or not the defendant had proved reasonable and probable cause for publishing the editorial was for the court, and not the jury, as this court in *Briggs v. Garrett*, 111 Pa. 404, and in numerous other cases held. See *Ingram v. Reed*, 5 Pa. Superior Ct. 550; *Com. v. DiSilvestro*, 31 Pa. Superior Ct. 537, 553; *Williams Printing Co. v. Saunders*, 73 S. E. 472, 477; *Morton v. Knipe*, 112 N. Y. S. 451; *Locke v. Bradstreet Co.*, 22 Fed. 771 (Minn.). In *Lovell Co. v. Houghton*, 116 N. Y. 520, 22 N. E. 1066, 6 L. R. A. 363, the New York Court of Appeals in its opinion by Judge PARKER said: "Whether the subject matter to which the alleged libel relates, and the interest in it of defendants, are such as to render the publication privileged, and therefore prima facie excusable, is a question for the court . . . [and] where, as in this case, the facts upon which the claim of a privileged communication is sought to be established are uncontradicted, upon the court rests the duty of determining, as a matter of law, whether the communication be privileged or not."

If the publisher of an American newspaper was informed by five reliable newspaper men that a certain news writer had declared that he was in sympathy with Stalin's subjugation of Lithuania and Latvia and with his [Stalin's] taking over the government of Poland and that he was in sympathy with Stalin's liquidation of thousands of Polish political and intellectual leaders, and if the newspaper published that fact either by an editorial or a news article the communication would unquestionably be privileged under the American theory of freedom of expression and freedom of the press. Justice, afterwards Chief Justice, PAXSON, speaking for this court, said in *Briggs v. Garrett,* supra, in reference to the Constitutional guarantee of freedom of speech: "I would rather endure undeserved reproach than by any act of mine to impair a rule of so much importance to the public welfare." Under the Constitution, no individual and no newspaper corporation, is required to pay $8,000 or any other sum of money for exercising his right of free speech on a proper occasion, in a proper manner and from a proper motive, his or its statement being made on reasonable and probable cause.

In the language quoted from Chief Justice SHAW earlier in this opinion, the jury in this case "decided against the law", "misapprehended the weight of the evidence" and "abused their trust." [5] This being so the

---

[5] It is not necessary to conjecture as to *the reasons* for the verdict which was so palpably contrary to the evidence, but in order to warn attorneys not to inject religion into the trial of cases, attention should be called to the fact that in this case, over the objection of defendant's counsel, the religious affiliation of this plaintiff was brought into the record and allowed to remain there. The jury was not even warned to disregard it. When J. David Stern, the chief executive of the defendant company, was on the witness stand, the plaintiff's counsel asked him: "You knew, didn't you, at that time that the Nazi persecution of minorities included other than Jews, didn't you? Mr. Stern answered: "Yes". Plaintiff's counsel then

duty was imposed upon the court to set the jury's verdict aside. The editorial in question having clearly been privileged and the plaintiff not having proved any abuse

---

asked: "You knew O'Donnell was a Catholic, didn't you?" This is the first time the writer ever heard of any attorney injecting into a case the religious affiliations of either a litigant or a witness. No more grossly improper question than the question thus asked J. David Stern can be imagined. So careful is our law to keep religion out of the trial of a case that the Act of April 23, 1909, P. L. 140, *forbids* the questioning of any witness in any judicial proceeding "concerning his religious belief". If a *witness'* religious belief cannot properly be injected into a judicial proceeding, a *litigant's* religious belief certainly cannot be. To inject a litigant's religion into a judicial proceeding is more offensive to propriety and to due process of law than is the injection of the fact that a defendant in a negligence case carries liability insurance. The appellate courts have frequently declared that for plaintiff's counsel to bring out in any way the fact in the trial of a negligence case that the defendant is insured against liability is such a gross impropriety as to require the trial judge to immediately declare a mistrial. See *Conover v. Bloom,* 269 Pa. 548; *Curran v. Lorch,* 243 Pa. 247; *Scranton Gas and Water Co. v. Weston,* 63 Pa. Superior 570; *Walsh v. Wilkes-Barre,* 215 Pa. 226; *Martin v. Baden Boro.,* 233 Pa. 452; *Hollis v. U. S. Glass Co.,* 220 Pa. 49; *Lenahan v. Coal M. Co.,* 221 Pa. 626. When plaintiff's counsel asked J. David Stern as to his knowledge of O'Donnell's religious affiliation and stated that affiliation, the trial judge should have immediately declared a mistrial. No verdict which may have been brought about, or even influenced by a consideration of a litigant's religious affiliations should be allowed to stand in a court of justice.

The American political system, including its system of jurisprudence, is based on the complete separation of religious affairs from civic affairs. Jeremiah S. Black, who was at one time Chief Justice of the Supreme Court of Pennsylvania and later was Attorney General of the United States and Secretary of State of the United States, aptly said: "The manifest object of the men who framed the institutions of this country, was to have a State without religion, and a Church wihout politics—that is to say, they meant that one should never be used as an engine for any purpose of the other, and that no man's rights in one should be tested by his opinions about the other . . . Our fathers seem to have been perfectly sincere in their belief that the members of the Church would be

of the privilege, judgment should be entered for the defendant non obstante veredicto.

Mr. Justice HORACE STERN and Mr. Justice PATTERSON concur in this dissenting opinion.

more patriotic, and the citizens of the State more religious, by keeping their respective functions entirely separate. For that reason they built up a wall of complete and perfect partition between the two . . . They gave to bigotry no possible chance for thrusting herself into civil affairs without doing so in flat rebellion to the Constitution."