ALTOONA CLAY· PRODUCTS, INC.,
a corporation, Plaintiff,

v.

DUN & BRADSTREET, INC., a
corporation, Defendant,

v.

C. R. GROVE, joined as Plaintiff by
Court Order.

Civ. A. No. 63–724.

United States District Court
W. D. Pennsylvania.

July 16, 1968.

See also D.C., 37 F.R.D. 460.

Evans, Ivory & Evans, Pittsburgh, Pa., for plaintiff.

Joseph A. Williams, Pittsburgh, Pa., for C. R. Grove.

Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendant.

## OPINION

WEBER, District Judge.

Prior aspects of this case have been reported in 37 F.R.D. 460, 246 F.Supp. 419, and 367 F.2d 625. It is a diversity action based on allegation of libel on plaintiff's business reputation. Defendant is a mercantile agency supplying reports to subscribers as a guide to their business dealings. Plaintiff is a corporation engaged as an independent sales agency, buying brick products from manufacturers and selling to construction contractors. Plaintiff was also a subscriber to defendant's service. In response to an inquiry from an interested subscriber defendant undertook to prepare a new report on plaintiff which was circulated to fifteen (15) subscribers who had requested such reports. After a statement of estimated financial worth, and an estimated statement of assets and liabilities, the report contained two notations taken from the court records of Blair County, Pennsylvania. One was a report that plaintiff had assigned all its accounts receivable, past, present and future, to a bank. This was true. The other was a notation of the entry of a confession of judgment in a penal sum of $60,000 with a docket number and term. This was false as applied to plaintiff firm, because the plaintiff's name was "Altoona Clay Products, Inc." and the judgment was actually entered against "Altoona Clay Products Company, Inc.", a predecessor to plaintiff's business which had changed its corporate name and sold its personal property and good will to plaintiff corporation when plaintiff was organized, but which continued to own real estate conveyed to it under its former corporate name.

At the first trial of this action, plaintiff was limited to proof of special damages in support of a libel per quod, and the court granted defendant's motion for directed verdict in its favor because of the failure of proof of special damages. On appeal it was determined that a new trial must be granted because the publication was actionable without proof of special damages, and that proof of special damages should be submitted to the jury. The jury found no special damages, but awarded general damages of $110,000. The court refused plaintiff's request to argue for and receive a charge on punitive damages.

Defendant moves for judgment N.O.V. and for new trial on arguments that will be treated in part in this opinion.

█ Defendant argues that the verdict is excessive, which requires a new trial, and entirely unsupported by the evidence, which requires a directed verdict for defendant. It is an understatement to say that the verdict is shocking to the conscience of the court. While general damages are permissible in an action of libel per se and require no proof of special damages to support them, they are none the less compensatory, and must bear some relation to the evidence. 3 Restatement, Torts, § 621. A business corporation can only be damaged with respect to its credit, its profits and its property. The plaintiff here used the same evidence in support of its claim for general damages as was used to support the claim for special damages. The president of plaintiff corporation testified to the imposition of credit restrictions as a consequence of which he did not bid on certain contract opportunities as a result of which he estimated a loss of profits. We held this insufficient to support a claim for special damages in the first trial of the action, but under the mandate of the Court of Appeals they were submitted to the jury in the second trial. The jury found no special damages.

"A successful plaintiff in an action for libel or slander is entitled to recover such actual or compensatory damages as are the natural and direct or proximate result of the publication, but not speculative or remote dam-

ages, the rule applying to special as well as general damages."

53 C.J.S. Libel and Slander § 240.

At the trial we were conscious of the liberality that must be exercised in viewing evidence of claims for special damages resulting from an alleged impairment of credit because the nature of such loss precludes definite ascertainment of the specific amount lost. Cf. Dun & Bradstreet v. Nicklaus, 340 F.2d 882 [C.A. 8, 1965]. The nature of plaintiff's evidence was highly speculative but it was nevertheless submitted to the jury. The absence of special damages is a factor to be considered in weighing the adequacy or excessiveness of general damages awarded, Regan v. O'Toole, 348 Pa. 364, 35 A.2d 55 [1944]. The fact that plaintiff is a business corporation and can be injured by false publication only with respect to its credit, property, or profits, limits the scope of compensatory general damages which it may recover, as distinguished from the damages which an individual can recover. Erick Bowman Remedy Company v. Jensen Salsbery Laboratories, 17 F.2d 255, 257 [8th Cir., 1926]; Farbenfabriken of Elberfeld Co. v. Beringer, 158 F. 802, 804 [3rd Cir., 1908].

■ We are very conscious of the admonition of Lind v. Schenley Industries, Inc., 278 F.2d 79 [3rd Cir., 1960] that a grant of a new trial must be based on sound grounds and should not be made unless it is quite clear that the jury has reached a seriously erroneous result. The court may be compelled by some undesirable or pernicious element that has been introduced. When a trial has been long and complicated and deals with a matter not lying within the ordinary knowledge of jurors, a verdict may be scrutinized very closely.

There was abundant evidence that the financial decline in this corporation had been proceeding for some years. Its capital had been seriously impaired three years before by a purchase of the outstanding controlling stock from capital contrary to the provisions of the Pennsylvania business corporation code. Even the testimony of the plaintiff's own witnesses, both its creditors and its expert financial witnesses, showed the serious financial straits of the corporation before this publication. The corporation had been delinquent in its accounts, had been given prior notices of credit limitations, and had been refused deliveries for failure to keep its payment commitments. Even after publication of this report, in March of 1963, a creditor imposed a sixty (60) day credit limitation because he felt accounts more than sixty (60) days in arrears were in peril, and plaintiff was over sixty (60) days overdue.

A highly important factor in the minds of witnesses for plaintiff was the truthful memorandum that plaintiff had assigned all its accounts receivable, past, present and future, to a bank, leaving it with few current assets to meet substantial current liabilities.

All of this testimony was reviewed in connection with plaintiff's claim for special damages and on the basis of it the jury found no special damages had been suffered by plaintiff. It is highly inconsistent that on the same evidence they made the award of general damages in question here.

Apart from the lack of evidentiary basis for the damages here there were certain highly prejudicial elements introduced at trial. Despite the prior ruling of the court that it would not submit the question of punitive damages to the jury, and despite the side bar denial upon offer of proof of defendant's financial strength in support of a claim for punitive damages, plaintiff's counsel in his summation argued to the jury in reference to this case:

"It is going to be watched by many small businesses who will know that by a jury telling a large credit company that they must publish only the truth about their finances, and their credit and solvency, will not be permitted to get away with issue false credits and damaging and even killing little businesses."

This was not inadvertence, it was a deliberately provocative invitation to the jury to disregard their oath, to disregard the charge of the court, and to assess damages against defendant because it was a large corporation and should be punished. The objection to this remark was sustained and the jury admonished, but the courts are well familiar with the ineffectiveness of such admonition once the suggestion has been planted in the minds of the jurors.

A second serious and prejudicial element in the closing address was a suggestion as to how much their damages should be. Plaintiff's counsel referred to the estimated balance sheet shown upon the report in question. He referred to the liabilities shown thereon and totalled them up to $108,900 and then added:

> "Now it has been told to you and it is correct, that all of the assets of this company were turned over to a receiver-assignee for creditors they still owe, somebody who is going to take whatever assets they have and pay the bills that they owed at that time, $108,000.
>
> When they assign these things, these items, they assign all of their property; that includes this lawsuit and any proceeds of that, go to these creditors first to be paid off. You see what they are."

It is curiously noteworthy that the general damage verdict was for $110,000, almost the same figure. In addition to this being a totally unwarranted argument and improper suggestion to the jury, it was untrue because plaintiff did not include the assets shown on the balance sheet which were also for the use of creditors, and which, according to plaintiff's arguments, showed the plaintiff to be a solvent company.

We do not deem objection to this argument waived by counsel's failure to object. Counsel for the defendant was forced to voice objection to plaintiff's closing at other points, which the court sustained, and defense counsel was being forced into a position of disadvantage by making such objections. Such objections have been recognized as hazardous, London Guarantee & Acc. Co. v. Woelfle, 83 F.2d 325 [8th Cir., 1936], and failure to object is not fatal where obvious prejudice has occurred. Robinson v. Pennsylvania R. R. Co., 214 F.2d 798 [3rd Cir., 1954].

The evidence in this case with respect to damages cannot sustain this verdict. Gross sales had declined in each year from 1958 and followed the same downward trend in 1963. Net operating losses in 1963 followed the same upward trend as in the prior years. Current liabilities exceeded current assets in 1961 and the ratio increased in 1962. Both of plaintiff's financial experts testified that without regard to the mistaken notation of judgment the company was not financially stable. A very critical factor in the minds of witnesses was the undeniably true item contained on the credit report in question that in 1962 plaintiff had assigned all its accounts receivable, past, present and future, leaving practically no current assets free for the payment of current obligations. By the plaintiff's own evidence, the plaintiff corporation was shown to be insolvent by a number of tests without regard to the publication of the erroneous report of judgment. It was unable to pay current bills. As of December 31, 1962, nine days before the report in question, the company's own balance sheet showed a net worth of $4,013.13, but the counterbalancing asset was an item listed as an asset worth $4,326. represented by a note of a former employee who had embezzled funds, an item of very doubtful value. This financial statement is of doubtful value in proving worth because it did not reflect the serious impairment of capital caused by buying in the controlling stock in the corporation in 1960, and because of its failure to set up any reserve for doubtful accounts receivable which was entered in the 1963 statement as $8,420.16.

Thus the evidence shows that at the time of the publication the corporation

had little if any net worth, a consistent history of loss, a consistent history of dwindling sales, a consistent history of lateness in paying accounts, and the assignment of its accounts receivable.

Plaintiff corporation was essentially a one man corporation engaged in sales of brick products. Plaintiff's president was an employee of the former corporation whose mortgage and change of corporate name led to the confusion of names involved here. He and the proprietor of the former business founded a new corporation which bought the business assets of the old. Plaintiff was a minority stockholder, but after a year of operation disagreements arose, and the majority shareholder was bought out by stock redemption using capital of plaintiff corporation and by a peculiar salary bonus arrangement supported in part by profits in 1958, the sole good year. Plaintiff's president participated in a substantial bonus at the same time, and has been the sole or principal stockholder since. Thereafter sales declined, there was no profit, but plaintiff's president continued to draw his salary. When plaintiff corporation ceased to do business plaintiff's president went to work as a salesman for one of its former suppliers and has done well. Plaintiff's president attempted initially to conduct this lawsuit in the name of the corporation and it was only after compulsion of court order that the state appointed receiver for the benefit of creditors, who had received a general assignment of the corporation's assets, was made the real party plaintiff, although the trial was conducted by plaintiff's original trial counsel.

We do not regard the evidence of damages suffered by the receiver's sale of assets over a year later at less than their claimed value to be of much value. There is no evidence to support the correctness of the values claimed, and no evidence to show diligence on the part of the receiver. We believe that this evidence is too remote and speculative to have any probative value on the issue of damages, particularly in view of the corporation's history of business decline.

■ Plaintiff has alleged loss of credit as a result of the erroneous report. This makes his claim actionable per se and entitles him to general damages on proof that credit was so restricted. Regardless of whether loss of credit was actually proven, which we will consider later, we do not believe that loss of credit of a business firm, standing alone, is proof of damages, unless it connects itself with some tangible pecuniary loss of which it is the cause. Eckel v. Murphey, 15 Pa. 488, 495 [1850]; Smith v. Western Union Telegraph Co., 150 Pa. 561, 564, 24 A. 1049 [1892].

■ On the basis of the foregoing, assuming plaintiff to have met the burden of proof on the other elements required of it, we find the damages awarded grossly excessive, unsupported by evidence, inconsistent with the finding of no special damages, and subject to the prejudicial influence of improper argument of plaintiff's counsel.

In the first trial of this case the trial court, as a result of arguments on pretrial motions, held that the publication in question, a mercantile report containing an erroneous item reporting the entry of a judgment against plaintiff, constituted a libel per quod which required the proof of special damages. Although defendant had raised the objection that special damages had not been pleaded with particularity, as required by Pennsylvania law, and the Federal Rules of Civil Procedure, the court held that in view of the extensive discovery that had been conducted, defendant was informed as to the nature of the claim for damages, and denied the defendant's motion based on these grounds. We held that no general damages were allowable under such circumstances. [See 37 F.R.D. 460].

At no point did plaintiff raise the contention prior to trial, despite extensive pretrial arguments, that the report imputed insolvency and was thus libelous per se. No innuendo was pleaded to

this effect. On the eve of trial, plaintiff's counsel for the first time stated that he expected to argue and submit evidence that the report imputed insolvency and would require no proof of special damages because an imputation of insolvency is a libel per se. This was overruled by the trial court which found no such imputation. After hearing plaintiff's case the court dismissed plaintiff's action for failure of proof of special damages. The Court of Appeals reversed this decision and remanded for a new trial. [367 F.2d 625].

We take the following guidelines from the opinion of the Court of Appeals as the law of the case:

1. "The plaintiff's allegation that defendant had 'erroneously' reported to plaintiff's creditors that a large judgment had been entered against it was actionable per se. The complaint clearly states that plaintiff's credit was injured as a result of the publication." (p. 629.)

2. "We read the report as not only imputing insolvency but demonstrating it: plaintiff's estimated liabilities (the liabilities column plus the $60,000 judgment) are reported as far exceeding its estimated assets. The report is, therefore, defamatory on its face." (pp. 630–631).

3. "Under these circumstances (the extent of pretrial discovery) and upon consideration of the liberalized pleadings effectuated by the Federal Rules, we hold that plaintiff's failure to attach to its complaint a copy of the report could not preclude it from arguing that the report demonstrated insolvency, nor can we perceive any prejudice to the defendant by plaintiff's belated assertion of imputed insolvency." (p. 631).

The controlling law here is the law of Pennsylvania. Generally, Pennsylvania law in this field follows the Restatement of Torts, § 558 et seq. The requirement of 3 Restatement, Torts, § 613, have been codified by statute in Pennsylvania.

"12 P.S. § 1584a Burden of Proof.

(1) In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(a) The defamatory character of the communication;

(b) Its publication by the defendant;

(c) Its application to the plaintiff;

(d) The recipient's understanding of its defamatory meaning; * * ".

The defamatory character of the communication has been established as a matter of law. Publication by the defendant and its application to the plaintiff is not contested. We then come to requirement (d) of the statute, the burden of proof on the recipient's understanding of the defamatory meaning.

Disposition of these questions in Pennsylvania follows the rule of 3 Restatement, Torts, § 614:

"TOPIC 2. FUNCTION OF COURT AND JURY.

§ 614. Determination of Meaning and Defamatory Character of Communication.

(1) The court determines whether a communication is capable of a defamatory meaning.

(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient."

The Court, under Restatement, Torts § 614(1), must initially determine whether the publication complained of is capable of the meaning ascribed to it by the plaintiff and whether this meaning is capable of a defamatory interpretation. Restatement, Torts, § 614, Comment (b). Richwine v. Pittsburgh Courier Publishing Co., 186 Pa.Super. 644, 142 A.2d 416 [1958]. It would seem, then, that the first part of this two part inquiry is a determination of innuendo.

"The word 'innuendo' has been a source of great confusion in the law of defamation. Frequently, it has been improperly used *as the meaning of the inferences* which may be prop-

erly drawn from the words complained of. As stated in Sarkees v. Warner-West Corp., 349 Pa. 365, 367, 368, 37 A.2d 544, 546 (1944), repeating what was said in Naulty v. Bulletin Company, 206 Pa. 128, 55 A. 862, 'The purpose of an innuendo, as is well understood, is to define the defamatory meaning which the plaintiff attaches to the words; to show how they come to have that meaning and how they relate to the plaintiff. Price v. Conway, 134 Pa. 340, 19 A. 687, 8 L.R.A. 193. * * * ' " Cosgrove Studio & Camera Shop v. Pane 408 Pa. 314, 182 A.2d 751, 754 [1962]. The Court of Appeals having decided the inquiry under § 614(1) in favor of the plaintiff by finding that the communication in question was libelous per se, the jury had to decide whether the communication was so understood by its recipients in the defamatory meaning which the plaintiff argues for it. Whether or not an innuendo was required to be pleaded has no bearing on this second inquiry.

Under this rule the jury in this case was instructed to make the determination of whether the defamatory meaning which the law allows to such a publication, that is, the meaning of insolvency, was actually understood by the persons who received the report.

■ The plaintiff objected to such instruction and now opposes defendant's motion on the grounds that no such instruction should have been given because libel per se requires no determination of the understanding of its defamatory meaning by the jury. With this we cannot agree. This is one of the essential elements of defamation. The clear language of the Pennsylvania statute imposes a burden of proving the understanding of the recipient upon the plaintiff.

In submitting this question to the jury the trial court followed both the Restatement rule and the decided cases in Pennsylvania. They repeat this requirement with unanimity and consistency.

In Weider v. Hoffman, 238 F.Supp. 437 [M.D.Pa.1965], the court in reviewing this problem stated:

"The court instructed the jury that such words on their face were capable of a libelous meaning. This was in accordance with the Restatement, Torts, § 614(1) which had been cited with approval by the Pennsylvania Supreme Court as defining the function of the court in libel cases, such as here, where 'the words are defamatory on their face.' * * * (citations omitted). The jury then was instructed that whether the words did in fact convey a libelous meaning to persons to whom they were communicated was for the jury to determine. This was in accordance with Restatement, Torts, § 614(2), which defines the function of the jury. Bocchicchio v. Curtis Publishing Co., E.D.Pa.1962, 203 F.Supp. 403; Bauseman v. Norristown Herald, Inc., 1945, 351 Pa. 634, 643, 41 A.2d 736. The function of the jury in determining whether a communication, capable of a defamatory meaning, was so understood by its recipient, would be a finding with respect to a plaintiff's burden of proof as set forth in 12 P.S. § 1584a(1) (d, e), which appears to be an adoption of the Restatement, Torts § 613." (p. 441).

■ A similar rule was followed in Bocchicchio v. Curtis Publishing Co., 203 F.Supp. 403 [E.D.Pa.,1962]:

"Both the Pennsylvania cases* and the
* (footnote citations omitted).
Federal cases* binding on this court have held that, under Pennsylvania law, it is for the jury to determine whether a communication, capable of a defamatory meaning, was so understood by its recipient. See Restatement of Torts, § 614."

Bauseman v. Norristown Herald, Inc., 351 Pa. 634, 41 A.2d 736 [1945], the most frequently cited Pennsylvania authority, repeats the rule in almost identical language:

"It was for the court to say, as a matter of law, whether the writings

in suit were capable of a libelous meaning. It they were, it then became the jury's duty to determine whether they have such meaning in fact."

Therefore, the plaintiff must meet the burden of proof that the recipients understood the report in the sense that he argues for it, as showing that the plaintiff was insolvent. We believe that we must clearly distinguish that such an understanding must be derived from the erroneous item of the report, because there is no question of the truth of other items in the report which reflect serious financial problems faced by the defendant. Furthermore, this meaning must be found to have existed in the minds of the recipients, and not in the opinion of what other people may think that a recipient would construe it. "It is not competent, in an action of libel, to aid the innuendo by the mere opinion of a witness." Pittsburgh A. & M. Pass. Ry. Co. v. McCurdy, 114 Pa. 554, 8 A. 230 [1887].

We must examine the evidence to determine whether, viewed in th light most favorable to the plaintiff, any recipient understood the report to mean that the plaintiff was insolvent in the sense that plaintiff argues, that the mistakenly reported judgment of $60,000 added to the estimated liabilities shown on the balance sheet, resulted in the report being interpreted by the recipient to mean that plaintiff's liabilities exceeded its assets. No recipient so testified. No witness who was either a recipient or who had received word of the report through its receipt by his employer testified to any such construction. The only mention of "insolvency" by plaintiff's witnesses came from the two financial experts called by plaintiff to explain the innuendo which plaintiff was trying to prove, but they were not recipients and they knew nothing about the reaction of any actual recipient.

Of the fifteen (15) possible recipients of the report only one actual recipient was called. Two other witnesses were not recipients, but were sales representatives of firms whose credit managers had received the report. They had heard of it, and one had seen it. None of these three construed the report to mean insolvency, none of them could testify to any construction placed upon it by their credit managers, and none of them could testify as to the motives of their credit managers.

The report was mailed January 9, 1963. Nothing happened to plaintiff in connection with or as a result of the report until April 10, 1963. At that time plaintiff's president was visiting Mr. Overdorff, of Quaker Sales, a supplier of plaintiff from which plaintiff held an exclusive sales agency. Overdorff had been complaining of plaintiff's delinquent account for a long time and he had advised plaintiff's president to borrow money to finance his working capital. Plaintiff's president had told him that the company had no assets to secure such a loan. Overdorff's reaction to the report was that the reported judgment indicated that the plaintiff corporation had in fact borrowed money to finance accounts payable but had not paid Quaker Sales anything on account. Plaintiff's president learned of the report in this way for the first time, and secured a correction from defendant to the subscribers on the next day of transacting business, but Quaker Sales continued to press him for the payment of its delinquent account. Quaker Sales did not deny plaintiff credit or cancel its exclusive sales agency. Nothing in Overdorff's testimony showed that he understood the report to mean that plaintiff was insolvent.

The second witness, Seibert, sales agent for Central Commercial, for whom plaintiff was a franchised dealer, testified that his firm had been having credit troubles with plaintiff in the preceding year, and that in the spring of 1963 the account was long past due. Central Commercial's Credit Manager had sent a letter to plaintiff on March 22, 1963, informing it that its credit would be limited to $5,000 and sixty days. This letter made no reference to the January 9, 1963 report of defend-

ant, and the witness had no personal knowledge of the motive for the letter. Plaintiff's account had been 90 days overdue in the year before, and was beyond the creditor's normal thirty day limit. It was shown that on April 11, 1963, on the day following the plaintiff's discovery of the existence of the report, Central Commercial's Credit Manager wrote to plaintiff firm asking for its explanation of the judgment reported on the January 9th report as well as the item on said report showing that plaintiff's firm had previously assigned all its accounts receivable to secure a loan from a bank. To this plaintiff did not reply.

The third witness, Johnson, was a salesman newly appointed in March 1963 for plaintiff's territory. His employer was Glen Gary Shale Brick Corp. for whom plaintiff was also a distributor. Plaintiff was also indebted to this firm, and in the previous year it had been warned of a sixty day limit. He testified that in March of 1963 he had been told to watch plaintiff's account by the credit manager because the account was over sixty days past due, and the witness felt that any account over sixty days due was in jeopardy. This witness had seen the defendant's report of January 9 in March of 1963. He did not testify that he took it to mean that plaintiff was insolvent, but he felt that the entry of judgment, along with other factors, particularly the assignment of accounts receivable, made plaintiff firm "a little shaky." Plaintiff's exclusive agency for this firm was continued after the report, and plaintiff's credit terms of sixty days were beyond the normal thirty day term of Glen Gary.

No witness established any link between the credit report's mistaken entry of judgment and any subsequent action taken by their companies. The evidence that there was any cause and effect relationship was at best only inferential. These inferences may be construed either way from the report itself; the undeniably true statement of the credit report concerning the plaintiff's assignment of its accounts receivable was acknowledged to be a reason for any subsequent actions that were taken. The fact that no immediate reaction of any kind developed from the circulation of the credit report to creditors who did have cause to worry about the ability of plaintiff to pay his accounts negates any inference that any recipient understood the credit report to impute insolvency.

It is important to note the lack of evidence of proximate cause here. No recipient of the report pointed to the erroneous report of judgment as the cause of their actions. All were familiar with plaintiff's slowness in paying accounts. Typical of this failure to establish connection with the erroneous item was Seibert. He testified that Central Commercial placed credit restrictions in March 1963 on Altoona "because there was a bad credit report on them." (T. p. 266). Of course, this was hearsay as the following lines show, but plaintiff's proof rises no higher. But it was true that there was a bad credit report on plaintiff without regard to the erroneous entry. Both plaintiff's financial experts so testified. The true portions of the report showed insufficient working capital, inadequate quick assets, and the prior assignment of the bulk of quick assets, the accounts receivable, all of which would warn any credit manager.

Overdorff's reaction was that the erroneous item made him mad because he thought the judgment evidenced loan to pay delinquent accounts, and he had received no payment on his own delinquent account.

Johnson became acquainted with the account in March 1963, when he first took over the territory. He had been warned to watch it by his employer. It was over sixty days past due and he felt any account of this age was in peril. His knowledge of the actions of his credit manager is hearsay.

None of these witnesses establish a causal connection with the erroneous item, sufficient to prove proximate cause.

It is also noteworthy that credit restrictions were applied and continued after the erroneous item had been explained by defendant in its correction notice of April 15, 1963, while plaintiff continued to be further delinquent in payment, particularly before the beginning of a new construction season.

Pegnetter, the president of plaintiff, testified to other credit restrictions. His testimony is largely hearsay and speculation.

Pegnetter's testimony is at best circumstantial. Plaintiff's business was declining and continued to decline in sales. But the credit report was not shown to have been sent to the persons or firms to whom he sold, only to those from whom he bought. His capital was badly impaired; he had no working capital; he had assigned his accounts receivable, which were the only assets available for the payment of his current liabilities. In the midst of this history of business decline the subject credit report appears. Nothing happened thereafter which hadn't happened before. His creditors continued to press for payment at a time when building material supply houses make a special effort to get last year's construction season's accounts cleaned up before a new construction season begins.

■ Where circumstantial evidence is relied on by a plaintiff in a civil case, the evidence must outweigh in the minds of the fact finder any other evidence and reasonable inferences therefrom which are inconsistent therewith. Smith v. Bell Telephone Company of Pennsylvania, 397 Pa. 134, 153 A.2d 477.

■ Plaintiff produced two expert witnesses who testified on this subject. They were offered as experts on the nature of credit and its function in the business world, which we believe was proper in the light of plaintiff's allegations of loss of credit and its resulting damage to its business. However, they were asked as to their opinion of how a recipient, a credit manager, would interpret the report. Both testified that in looking at the report as a whole, and adding the noted judgment to the liabilities, a business man might come to the conclusion that the firm was insolvent. However, a credit manager, to whom these reports are addressed, would not draw this conclusion. Such testimony was not without extensive qualifications and testimony on the adverse effect of the other unfavorable financial information shown and the undeniably true report of assignment of accounts receivable, regardless of the mistaken report of the entry of judgment. We are convinced that it was prejudicial error on our part to allow these expert witnesses to testify as to their opinion of a state of mind of a recipient. See P. A. & M. Pass. Ry. Co. v. McCurdy, supra. We think that the error was highly prejudicial to the defendant, because these were the only witnesses of the plaintiff who drew any imputation of insolvency from the report or who even used the word "insolvency" in their testimony.

On another aspect of the case, the plaintiff's pleading was found sufficient because it alleged that the report of judgment was erroneous and that the plaintiff suffered a loss of credit because of the erroneous report. The mere allegation of the erroneous report of entry of judgment alone is not actionable, it must be coupled with an allegation that plaintiff's credit was injured as a result thereof. (367 F.2d 629). Therefore, plaintiff was again under the burden of proving the allegation of loss of credit which made this report actionable. Again, viewing the evidence as a whole, there is no testimony that as a result of reading the erroneous report of judgment any subscriber refused to sell to plaintiff on credit. None of the plaintiff's creditors' firms so testified.

Plaintiff's credit continued under the same terms and the same notices as previously. He had been previously limited to sixty (60) days by warnings from creditors, he was given the same sixty (60) day warning after the report, he was delinquent more than sixty (60)

days before the report, he had failed to keep promise of payment and had been denied delivery.

We, therefore, conclude that the finding of the jury was contrary to the great weight of the evidence on the questions of the effect of the report on its recipients, and the causal relation between the report and the consequences alleged.

Defendant is an agency engaged in the business of reporting financial information to subscribers who request this service. The specific report in this instance was supplied to fifteen subscribers who had requested reports on plaintiff. Such reports have been held privileged, as was held in this case on prior appeal. (367 F.2d 625, 631). The reason for the privilege is that in furnishing information the agencies are supplying a legitimate business need, and that without the privilege few would undertake to furnish such information, and the cost thereof would be high, if not prohibitive. 15 Am.Jur.2d, Collection and Credit Agencies § 22. By statute in Pennsylvania, plaintiff has the burden of proof that defendant has abused the privilege. 12 P.S. § 1584a.

Taking all of the evidence and the inferences therefrom in the light most favorable to the plaintiff shows that defendant noted on the financial report concerning plaintiff the entry of a judgment which was in fact the obligation of another corporation of an almost identical name. Plaintiff produced evidence from two attorneys, expert in the field of searching titles to real estate, to show that had the defendant employed a person with the education and experience of a lawyer specializing in the search of records of title to real estate, there were notations on the index to the judgment dockets in the court house, from which the report was taken, that would indicate to a careful title searcher that he should inquire further in his search into the original documents to determine the exact identity of the person or the real estate bound by the judgment. It was also shown that defendant had in its own files information concerning the real debtor and the existence of this obligation against it.

Defendant argues that there was no evidence presented to establish the standard of care required of a credit agency and that the standard of care of a real estate title searching attorney could not reasonably be applied to the defendant. These experts did not establish a standard of care applicable to defendant's business, and to that extent their testimony is incompetent. Where expert testimony is relied upon to establish a standard of care required in a given situation, it must be directed to the knowledge, skill, and ability ordinarily possessed and exercised by members of the profession similarly situated. With respect to attorneys, this standard has been stated as:

"He is not bound to exercise extraordinary diligence, but only a reasonable degree of care and skill, having reference to the character of the business he undertakes to do. Within this standard, he will be protected so long as he acts honestly and in good faith." 7 Am.Jur.2d, Attorneys at Law § 168.

The same standard has been applied in medical malpractice cases.

"The physician must use such ordinary skill and diligence and apply the means and methods generally used by physicians and surgeons of ordinary skill and learning in the practice of the profession, i. e., in the same general line of practice in like cases to determine the nature of the ailment and to act upon his honest opinion and conclusions. Ward v. Garvin, 328 Pa. 395, 195 A. 885." McHugh v. Audet, 72 F. Supp. 394, 399 [M.D.Pa., 1947]; Duckworth v. Bennett, 320 Pa. 47, 181 A. 558 [1935].

There was no attempt on the part of the plaintiff to introduce evidence of the standard of care required of credit reporting agencies. In fact, the cases recognize that these agencies must be able to provide the business community

with the required information economically and quickly, and the evidence demonstrated that exercising the standard of care of an attorney searching real estate titles would require a much larger expenditure of time and money. The testimony of the plaintiff's expert attorney witnesses was admissible to explain to the jury the meaning of the records which were relied upon by the defendant's reporter, but was not competent to establish a standard of care applicable to defendant sufficient to overcome the privilege.

The remainder of the evidence was directed to proof of negligent handling of the information in the light of other information that was available to defendant to show the incorrect designation of the judgment as being against plaintiff corporation. Even if we were to apply a standard of ordinary negligence to defendant's actions and even if we were to find that it was guilty of want of reasonable care under the circumstances, there is no doubt that the same evidence showed that plaintiff itself was guilty of contributory negligence which would defeat any recovery based on a standard of negligence as a matter of law.

The plaintiff's corporate name is:
"ALTOONA CLAY PRODUCTS, INC." The corporation was chartered in 1957 by the Commonwealth of Pennsylvania. It had purchased the good will, business accounts, sales franchises and miscellaneous personal property of a predecessor corporation known as "Brick and Tile Sales Company," formerly known as "Altoona Clay Products Company, Inc." The original controlling stock in "Altoona Clay Products, Inc." was owned by Brick and Tile Sales Company and the first president of Altoona Clay Products, Inc., was the principal if not the sole stockholder of Brick and Tile Sales Company. The first business location of Altoona Clay Products, Inc. was the former business premises of Brick and Tile Sales Company, which continued to own this location. Brick and Tile Sales Company had been originally incorporated as "ALTOONA CLAY PRODUCTS COMPANY, INC." in 1926. In 1948, it purchased the business property where it was located, the deed of conveyance being made to "ALTOONA CLAY PRODUCTS COMPANY." In 1952, "ALTOONA CLAY PRODUCTS COMPANY" changed its corporate name to "Brick and Tile Sales Company." This change of corporate name was registered with the Pennsylvania Bureau of Corporations, and without such change no new corporation would have been granted a charter under the name of "ALTOONA CLAY PRODUCTS, INC." The Pennsylvania Business Corporation Law prohibits the incorporation of entities having deceptively similar names. 15 P.S. § 1202. Defendant would be entitled to rely on the fact that under Pennsylvania law there could be only one entity with the name "Altoona Clay Products" whether followed by the designation "Company" or "Inc.", one or the other of which words must appear in the corporate title under Pennsylvania law.

Brick and Tile Sales Company gave a mortgage and bond on its property. To conform to the record title the name of the obligor was listed as "Brick and Tile Sales Company formerly Altoona Clay Products Company". When the bond accompanying this mortgage was entered in judgment, it was indexed under both names, and the index to judgments carried the entry in the docket index as "Altoona Clay Products Co. al" in the same column in the handwritten index as would be for an entry against "Altoona Clay Products, Inc." In fact, there were entries in the indexes to secured transactions in the same office under the name "Altoona Clay Products Company" that were actually the obligations of the plaintiff.

The record is replete with evidence that plaintiff had used the name "Altoona Clay Products Company" to designate itself. Even on the witness stand, the plaintiff's president, its witnesses, and its local counsel could not avoid repeating this error. This confusion of names was actually done by plaintiff corporation in numerous documents: the only

financial statement ever furnished by plaintiff to defendant listed its name as "Altoona Clay Products Co."; captions of financing statements given to secured creditors for filing, signed by the plaintiff's president, carried its name as "Altoona Clay Products Company" and were so indexed on the court house records; plaintiff's president's own personal income tax returns showed his employer as "Altoona Clay Products Company, Inc."; the sales franchise from Central Commercial Company to plaintiff corporation was addressed to "Altoona Clay Products Company."

If the plaintiff's case on abuse of privilege is based upon negligent failure to distinguish between "Altoona Clay Products Company" and "Altoona Clay Products, Inc." in reporting a judgment, the evidence is overwhelming that the plaintiff's own actions in the treatment of its corporate name were equally negligent, and contributed to this confusion.

We, therefore, come to the conclusion that any claim that defendant has abused its privilege because of its negligence must be defeated by the evidence of plaintiff's own negligence which contributed to the mistake.

Viewed at its best, the plaintiff's evidence shows a mistake in confusing deceptively similar names. What becomes of the privilege in the face of such a mistake? In Briggs v. Garrett, 111 Pa. 404, 2 A. 513, 521, 522 [1886], the Supreme Court of Pennsylvania held:

"The difference between an honest mistake made in the pursuit of a proper object, and a willful falsehood coined for the purpose of deception, is so palpable that we may well be excused from dwelling upon it at length. It is mistakes, not lies, that are protected under the doctrine of privilege.

A communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made, in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel; actual malice must be proved before there can be a recovery. * * *

Where the communication is privileged, plaintiff must show that it was not true, and that defendant had no reasonable grounds to believe that it was true." (p. 414, p. 521 of 2 A.).

The Pennsylvania cases reviewing the privilege and the evidence necessary to overcome it have all found some element in addition to the falsity of the report to be necessary to defeat the privilege. In O'Donnell v. Philadelphia Record Co., 356 Pa. 307, 51 A.2d 775 [1947], cert. den. 332 U.S. 766, 68 S.Ct. 74, 92 L.Ed. 351 [1947] there was evidence of a republication of the defamation after suit had been brought. The Court noted that the jury might have found this to be " * * * convincing evidence of wrong motive [and] actual malice." (51 A.2d p. 779). In Purcell v. Westinghouse Broadcasting Co., 411 Pa. 167, 191 A.2d 662 [1963], the court used the terms " * * * reckless unconcern, culpable indifference and palpable irresponsibility * * * " to describe the conduct of a radio station in deliberately contriving a sensational "documentary" radio news report. Although the Court (p. 668) speaks in terms of " * * * want of reasonable care and diligence to ascertain the truth * * * ", it also speaks [one line above] on legal malice arising from a " * * * reckless and wanton disregard of another's rights * * * ". In Montgomery v. Dennison, 363 Pa. 255, 69 A.2d 520 [1949], the court recites "recklessness of consequences and a mind regardless of social duty * * * " in describing actions taken by the defendant solely on the basis of an anonymous communication, i. e., excessive publication and refusal to retract his statement after being told that it was not true (p. 528). In Diamond v. Krasnow, 136 Pa.Super. 68, 7 A.2d 65 [1939] the Court found that evidence of motivation in the circulation and the manner of publication of the false report (defendant was using the report to en-

force a collection of its own accounts) was proper for the jury's consideration of, inter alia, presence of malice and absence of privilege. (p. 69).

 Highly important in considerations of malice or wilful disregard of consequences is the evidence that defendant issued a correction upon the next available business day after learning of the error, after rechecking records and investigation of the Bureau of Corporations at the State Capitol to determine why there were two almost identical corporate names in existence. Such evidence rebuts any contention of actual malice, of which the evidence in this case is bare.

Analysis of these cases shows that any use by the Pennsylvania Courts of "lack of reasonable care and diligence" cannot be interpreted as ordinary, or simple, negligence. The facts of the cases, the conduct of the defendants are clear examples of reckless and wanton conduct. The language used by the Courts must be read consistently with these facts. Malice is the test. Lack of good faith is an element thereof. Lack of reasonable care and diligence rising to the level of reckless and wanton conduct in the truth-searching process is sufficient to find malice and defeat the privilege.

Most recently, reviewing the decisions of the United States Supreme Court, the Court of Appeals for this Circuit has affirmed this standard.

"Negligent failure to check the accuracy of statements in an advertisement and to discover misstatements therein, 'is constitutionally insufficient to show the recklessness that is required for a finding of actual malice'. New York Times Co. v. Sullivan, supra [376 U.S. 254, at pages 287–288, 84 S.Ct. 710, at page 730, 11 L.Ed.2d 686 (1964)]. Otherwise stated, investigatory failures alone are insufficient to show recklessness on the part of a newspaper.

\* \* \* \* \* \*

Upon consideration of the evidence we are of the opinion that it fails to estab-

lish that the advertisement was published by the defendant with 'reckless disregard' as to whether the statements in it were true or false." Baldine v. Sharon Herald Co., 391 F.2d 703, 706–707 (3rd Cir., 1968).

 With particular reference to the reports of mercantile reporting agencies it has generally been held that because of the business utility of such reports, their confidential nature, their limited distribution, and the necessity for speed in their preparation, their privileged character is not lost merely because the report contains false information or because the agency was negligent in its preparation of the report. 23 Am.Jur.2d, Collection and Credit Agencies § 23; H. E. Crawford Co. v. Dun & Bradstreet, 241 F.2d 387 [4th Cir., 1957]; Petition of Retailers' Commercial Agency, 342 Mass. 515, 174 N.E.2d 376.

While New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 [1964] concerned a "public official", the decisions which followed it have broadened this concept to include "public figures", Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 [1967], and "public issues", Time Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 [1967]. In the latter case the Supreme Court held:

"\* \* \* the guarantees for speech and press are not the preserve of political expression or comment upon public affairs \* \* \* (and) 'must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' Thornhill v. State of Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093."

The long established recognition of the necessity of quick credit information in our commercial society certainly includes defendant's activities as being in the interest of the business community within the sphere of the privilege.

A recent case in New York has extended the same privilege to comments in a

news magazine about a diet food marketing concern:

"Certainly the subject matter of the article under review is of considerable public interest and it cannot be said of the conduct of the defendant with respect to motivation that the complaint meets the required standards. Certainly the intent here was not merely to injure through falsehood; rather the motivation was the protection of the public in the disclosure of a highly important matter affecting the public interest." All Diet Foods Distributors, Inc. v. Time, Inc., N.Y.Sup.Ct.N.Y.City, Jan. 2, 1968, Misc., 290 N.Y.S. 2d 445, Anno. 19 A.L.R.3d 1361, 1385.

■ Considering all of the evidence and the reasonable inferences to be drawn therefrom most favorably to the plaintiff, I conclude that as a matter of law that there is no evidence sufficient to support a finding that the publication was made with malice or a reckless disregard of its truth or falsity. At its highest probative force, the evidence showed that the report mistakenly confused the name of the plaintiff with an almost identical name of a predecessor in interest, a mistake wihch was induced or contributed to in whole or in part by the repeated actions of the complaining plaintiff. This would constitute simple negligence, which we believe was an improper standard upon which to submit this question to the jury.

## CONCLUSION

We conclude that this case fails in its proof. No recipient understood the libelous meaning which plaintiff alleges. Proof that any loss of credit was suffered as a direct and proximate result of the erroneous publication is lacking. There is no proof of damages, either special, by the jury's finding, or general in any amount more than nominal. The amount of general damages awarded is grossly excessive and shocking to the conscience of the court. There is insufficient evidence to overcome the legally established privilege of this communication that ris-

es to a higher degree than ordinary negligence.

We are convinced that the verdict was based upon incompetent and prejudicial evidence and arguments injected into the trial.

Because the determination of these matters are primarily jury questions, we feel that the proper disposition requires a new trial.

## ORDER

And now this 16th day of July, 1968, Defendant's Motion for Judgment in Accordance with Defendant's Motion for Directed Verdict is denied.

Defendant's Motion for New Trial is granted.